UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                         Case No. 06-20465

v.

                                   Honorable Nancy G. Edmunds

GARY BALL, JR.,

        Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR DISCOVERY [2859]

This matter is before the Court on Defendant Gary Ball's motion for discovery under Rule 6(a) of the Rules Governing § 2255 Proceedings. (Dkt. 2859.) On May 17, 2017, the Court held a hearing on this motion. For the reasons that follow, the Court GRANTS IN PART and DENIES IN PART Defendant's motion for discovery.

## I. Background

On June 3, 2010, a jury convicted Defendant of the following crimes: (Count One) substantive RICO; (Count Two) RICO conspiracy; (Count Fifteen) conspiracy to transport stolen vehicles; (Count Nineteen) conspiracy to possess with intent to distribute controlled substances–cocaine, marijuana, and ecstasy; (Count Twenty) conspiracy to possess with intent to distribute controlled substances–cocaine; and (Count Thirty-Six) conspiracy to alter, remove, and obliterate vehicle identification numbers. (Dkt. 1470.) On February 10, 2011, the Court sentenced Defendant to 30 years on Counts One, Two, and Nineteen (concurrent); 10 years on Count Fifteen (concurrent); 20 years on Count Twenty (concurrent); and 5 years on Count Thirty-Six (concurrent). (*See* Dkt. 1781.) The Sixth

Circuit affirmed Defendant's convictions and sentence on September 30, 2013, and his writ of certiorari was denied on April 7, 2014. (*See* Dkt. 2556.)

The matter now before the Court is Defendant's motion for discovery related to his 28 U.S.C. § 2255 motion to vacate his sentence, which is currently pending. Defendant's § 2255 motion claims that he is entitled to relief on several grounds. First, he maintains that both of his attorneys, Lee O'Brien and Lawrence Shulman, deprived him of his right to representation that is free from conflicts of interest. Second, Defendant argues that both O'Brien and Shulman provided ineffective assistance of counsel, regardless of whether they were operating under conflicts. Finally, Defendant alleges various forms of prosecutorial misconduct, including failures to disclose exculpatory material. To provide context for Defendant's discovery demands, the Court outlines the facts and allegations relevant to each of Defendant's § 2255 claims below.

### A. Representation by Lee O'Brien

Lee O'Brien was Defendant's attorney of record from October 3, 2006, the date Defendant made his initial appearance, to May 8, 2008, the date this Court terminated his representation. (Dkt. 166.) Defendant argues that O'Brien suffered from a conflict of interest throughout this entire period because he was "the subject of a criminal investigation by [the] same prosecuting authority, with the same case agent involved, and the investigation included allegations that O'Brien participated in some of the criminal activity with which Ball was charged in this case." (Dkt. 2713, at 20.) Defendant maintains that his defense was adversely affected because O'Brien "risked being inculpated if he were to have [Defendant] pursue plea negotiations." (*Id.* at 7.)

Defendant alleges that the Government was investigating O'Brien's involvement with Defendant's criminal activity as early as August 2005, over a year before Defendant made his initial appearance in this case. In support, Defendant points to an FBI 302 dated August 4, 2005,[1] in which Special Agent Edward L. Brzezinski reported the following: "The source advise [sic] that GARY BALL resides in a condominium that is owned by LEE O'BRIEN, who is an attorney at Jeffrey Figor's (phonetic) law firm. The source was told that O'BRIEN drinks a lot of alcohol and is "hooked on" cocaine, which he gets from GARY BALL." (Dkt. 2722-1, at 2.) Defendant also offers an FBI 302 from September 2005, but this report does not mention any criminal conduct. There, Brzezinski noted that O'Brien was one of the "attorneys that represent a lot of the Highwaymen Outlaw Motorcycle Gang (HOMG) members," as well as a "big dope addict[]" that associated with the HOMG on a regular basis, although not a patched member. (*Id.* at 4.)

Around a year after those FBI 302s, on September 6, 2006, the initial indictment in this case was filed under seal. (Dkt. 2.) Therein, Defendant was indicted as one of 17 defendants for conspiracy to possess with intent to distribute controlled substances (specifically cocaine, marijuana, and ecstasy). (Dkt. 3.) On October 3, 2006, the indictment was unsealed, and Defendant made his initial appearance, where he was represented by O'Brien. (Dkt. 1.)

Roughly a year after that, in November 2007, Special Agent Brzezinski went with the Downriver Auto Theft Taskforce to Todd Sullivan's body shop, where they found a re-

---

[1] "An FBI 302 is a form routinely used to memorialize an FBI interview of a witness." *United States v. Nathan*, 816 F.2d 230, 232 n.1 (6th Cir. 1987).

tagged, stolen Camaro. (Dkt. 2722-1, at 7-8.) According to Brzezinski, Sullivan claimed that the Camaro belonged to O'Brien and that he had purchased it from O'Brien. (*Id.* at 8.) Brzezinski further testified that this exchange with O'Brien occurred soon after:

> [I] ran into Lee O'Brien at the courthouse. And the first thing he came up to me and said, "I don't own that car." I said, "I never said you did." I said, "Do you know Todd Sullivan?" "No, I don't know Todd Sullivan. I didn't know who Todd Sullivan was until two days ago." I said, "He never paid you for a car?" He said, "Well, no, I sold the car, but I don't know Todd, I never met with him, never even talked to the guy, never even been in his shop."

(*Id.*)

O'Brien has supplied an affidavit reflecting his version of this exchange. (Dkt. 2795-1, at 11-12.) O'Brien avers that, "on or about November of 2007," while he was representing Michael Newberry in state court, Brzezinski became frustrated with Newberry's unwillingness to cooperate with authorities and accused O'Brien of selling a stolen Camaro. (*Id.* at 11.) O'Brien further avers that "[s]ometime thereafter, I received a call from Brzezinski advising me that he had a warrant for my arrest on a claim that I had made a False Statement to a Federal Officer." (*Id.*) O'Brien then concludes: "I say without hesitation that I was not able to enter into any meaningful plea negotiations on behalf of [Defedendant] . . . based on my concerns arising from Brzezinski's threats against me personally, and finally from his call advising me he had a warrant against me." (*Id.* at 11-12.) O'Brien does not claim that he was aware of the FBI 302s prepared in 2005.

Seventeen months after Defendant made his initial appearance, on March 12, 2008, O'Brien was charged via federal complaint with false statements in connection with possession of the re-tagged, stolen Camaro. (2722-1, at 11 (Dkt. 1 in 08-mj-30123).) Nine days after that complaint was filed, this Court set a hearing to discuss getting Defendant

a new attorney. (Dkt. 160.) On May 8, 2008, this Court terminated O'Brien's representation of Defendant, prior to any motion cut-off or trial date. (Dkt. 166.)

A year after O'Brien's termination, on May 14, 2009, the first superseding indictment was unsealed charging Defendant with additional counts. (Dkt. 198.) These included substantive RICO (Count One); RICO conspiracy (Count Two); conspiracy to commit murder in aid of racketeering (Count Thirteen); conspiracy to transport stolen vehicles (Count Fifteen); and conspiracy to possess with intent to distribute, and distribution of, cocaine (Count Twenty). (*Id.*) The original count of controlled substance conspiracy (cocaine, marijuana, and ecstasy), with which Defendant was charged in the initial indictment, became Count Nineteen in this first superseding indictment. (*Id.*) O'Brien was not charged in this first superseding indictment.

Seven months later, on December 15, 2009, a second superseding indictment was filed. (Dkt. 997.) In this indictment, Defendant was charged with an additional count of conspiracy to alter, remove, or obliterate vehicle identification numbers (Count Thirty-Six).[2] (*Id.* at 43.) O'Brien was charged in this second superseding indictment with a single count of false statements (Count Forty-Four). (*Id.* at 47.) This count was based on the same misconduct for which O'Brien was originally charged on March 12, 2008 and superseded the criminal complaint in that other case.

On April 1, 2010, twenty-three months after O'Brien's representation was terminated, Defendant went to trial.

---

[2] This Count alleged specifically that: (1) On October 3, 2006, Defendant possessed a stolen, re-tagged 1998 Cadillac Seville; and (2) On June 14, 2007, Defendant and Eugene Trumph possessed a stolen re-tagged truck. (Dkt. 997, at 44.)

On October 24, 2011, the Government filed a motion to dismiss the second superseding indictment as to O'Brien because "the ends of justice would best be served by this dismissal." (Dkt. 2240.) That same day, the Court entered an order dismissing O'Brien. (Dkt. 2245.)

Regarding the period when O'Brien represented Defendant, the Government notes: "Of the seventeen individuals charged in the original indictment, none of them resolved their cases between October 2006 and May 2008." (Dkt. 2765, at 10.) The Government also emphasizes that Assistant United States Attorney Diane Marion was telling everyone involved that a superseding indictment with additional charges was forthcoming. (*Id.*) The Government further proposes that any notion that Defendant and the Government were going to reach an agreement resolving his case prior to racketeering charges being added is nothing but fiction. (*Id.* at 11.) Defendant responds that the Government's representations are disingenuous because there is evidence that codefendants were cooperating during that period. (*See* Dkt. 2795-1, at 20-28.) An FBI 302 transcribed on January 23, 2007 reports that codefendant Monika Zuk interviewed with the Detroit FBI pursuant to a proffer agreement on January 22, 2007. (*Id.* at 20.)

**B. Representation by Lawrence Shulman**

Lawrence Shulman became counsel of record for Defendant on June 17, 2008, and he represented Defendant through trial and sentencing. (*See* Dkt. 175; Dkt. 1761.) According to Defendant, the conflicts of interest attending Shulman's representation arose from his prior and concurrent representation of Randell McDaniel, who was ultimately indicted in this case. Defendant maintains: "For Shulman, there was a clear risk to his

6

other client's (McDaniel's interests) if he were to pursue plea negotiations with [Defendant] or if he pursued certain lines of defense that would have well served [Defendant], but would have inculpated his other client (McDaniel) or undermined stories McDaniel had told the government in his cooperation." (Dkt. 2713, at 7-8.) Defendant continues: "Shulman's conflicts risked allowing counsel to exploit client confidences and secrets garnered from his former client and caused him to choose between duties to two clients." (*Id.* at 8.)

### 1. The Facts Related to Shulman's Alleged Conflict of Interest

At the time Shulman became Defendant's counsel in June 2008, McDaniel had not yet been indicted in this case. However, three months earlier, in March 2008, Shulman had made an appearance as counsel of record for McDaniel in a Michigan state criminal case. (Dkt. 2722-1, at 25.) In that case, McDaniel was indicted on a variety of counts related to stolen and re-tagged vehicles. (*See id.* at 27-30.) As the Michigan Court of Appeals recounted, the charges were based on the following alleged predicate incidents:

> (1) a 2001 conviction for receiving and concealing stolen property over $20,000; (2) violating MCL 750.535a by operating a chop shop on or about October 16, 2006; (3) violating MCL 750.535(7) by buying, receiving, possessing, concealing or aiding in the concealment of a Yamaha four-wheeler, Vehicle Identification Number (VIN) JY411007H0004823, for financial gain, knowing or having reason to know it was stolen; (4) violating MCL 750.535(7) by buying, receiving, possessing, concealing or aiding in the concealment of a Harley-Davidson Screaming Eagle motorcycle, VIN ULT6891ST00002849, for financial gain, knowing or having reason to know that it was stolen.

*People v. McDaniel*, No. 07-036304-FH, at 3 n.1 (Mich. Ct. App. Sept. 30, 2010).

One month after Shulman appeared as counsel for McDaniel in that state case, on April 9, 2008, case investigators, including Special Agent Brzezinski, held a coordination meeting, where they received "an update on the [state] prosecution of Highwaymen Randell

McDaniel." (Dkt. 2795-1, at 16.)  Notes from this meeting reveal a discussion of McDaniel's retention of his "new defense attorney, a Lawrence Shulman." (*Id.*)  The notes also reflect that Brzezinski "assured the group that McDaniel will be indicted to face federal criminal charges no matter what happens in Monroe County Circuit Court." (*Id.*)

Later that year, McDaniel was convicted in his state case of conducting a criminal enterprise and operating a motor vehicle chop shop. (*See* Dkt. 2795-1, at 2.)  He was sentenced on October 13, 2008. (*See id.*)  According to the docket sheet for the appeal in that case, Shulman remained as counsel during appeal, joined by John Signorino. (*Id.*)

On January 29, 2009, while Shulman continued to represent Defendant in this matter, McDaniel was indicted in another federal case, *United States v. Shafinia*. (Dkt. 1 in 09-cr-20039.)  There, McDaniel was indicted for conspiracy to possess with intent to distribute and unlawful distribution of a controlled substance. (Dkt. 2765-2 at 1-3, 6-7 (Dkt. 3 in 09-cr-20039).)  The indictment stemmed from a conspiracy to distribute fraudulently obtained prescription pills, including oxycodone, hydrocodone bitartrate, and benzodiazaphine.  On March 23, 2009, Shulman entered his appearance on behalf of McDaniel in that case. (Dkt. 40 in 09-cr-20039.)

Six months later, on September 17, 2009, Shulman filed a reply brief on McDaniel's behalf in the state appellate proceeding. (*See* Dkt. 2795-1, at 6.)  This appears to be the last action taken by Shulman in the state court case.

On December 15, 2009, McDaniel was indicted in the case before this Court in the second superseding indictment on a single count of conspiracy to transport stolen property in interstate commerce (Count Fifteen). (Dkt. 997, at 26-28.)  As stated above, Defendant

was also indicted on Count Fifteen (*See id.*)  As to Defendant, Count Fifteen alleged: (1) "On or about April 10, 2006, Gary Ball Jr. told Doug Burnett the HMC planned to 'rip' some motorcycles in Myrtle Beach"; and (2) "In or about May 2006, Louis Fitzner, Eugene Trumph, and Gary Ball Jr[.] unloaded stolen motorcycles at Southwest Transmission in Detroit, Michigan." (Dkt. 997, at 28.)  As to McDaniel, Count Fifteen alleged: "In or about May and June 2006, Randy McDaniel and David Foster supplied vehicle titles to members of the HMC." (*Id.*)  McDaniel's counsel in this case was Ronnie Cromer.  (Dkt. 1156.)

On March 3, 2010, McDaniel entered a guilty plea in the other federal case, and his sentencing date was set for June 14, 2010.  (*See* Dkt. 196 in 09-cr-20039.)  The AUSA who appeared at that plea hearing was Stephanie Dawkins Davis.  (*Id.*)

On April 1, 2010, Defendant's trial began.  McDaniel was not called as a witness. Nonetheless, as elaborated in the next section, Defendant has enumerated several instances in which he believes Shulman's performance was adversely affected by his prior and concurrent representation of McDaniel.

On June 14, 2010, the court in McDaniel's other federal case adopted a stipulation adjourning McDaniel's sentencing date.  (Dkt. 103 in 09-cr-20039.)  According to the stipulation, the parties agreed to an adjournment for two reasons: (1) Shulman had been in trial before this Court for the previous month, making it difficult for the parties to prepare for the hearing; and (2) "[t]he scoring of the guidelines by the probation officer in this matter [was] different from the scoring anticipated by both of the Parties," and "Counsel request[ed] additional time to resolve the issue."  (*See id.*)

On September 30, 2010, the Michigan Court of Appeals issued an order affirming McDaniel's state court conviction. *See People v. McDaniel*, No. 07-036304-FH (Mich. Ct. App. Sept. 30, 2010). On January 11, 2011, the Michigan Court of Appeals closed that case. (Dkt. 2795-1, at 6.)

On April 14, 2011, McDaniel's charge in this case was dismissed following the Government's motion to dismiss the second superseding indictment as to McDaniel. (Dkt. 1958.) The Government's motion stated the following: "The defendant pled guilty and was sentenced in case number 09-20039. The parties agreed that the instant case would be dismissed following a resolution in case 09-20039." (Dkt. 1957.) Defendant argues that this motion supplies proof that McDaniel was cooperating with the Government's investigation of the issues before this Court. Defendant also points to *United States v. $463,497.72*, 779 F. Supp. 2d 696 (E.D. Mich. 2011) as proof that McDaniel was a cooperating witness against him. However, that case never identifies McDaniel as a cooperator. *See id.*

Defendant next directs the Court's attention to the Michigan Attorney Grievance Commission's actions regarding Shulman's representation of Defendant. On April 2, 2013, Defendant filed a complaint with the Commission alleging improper conduct on Shulman's part. (Dkt. 2722-2, at 23.) Three weeks later, the Commissioners sent Shulman the following letter of admonishment:

> The matter was submitted to the Commissioners for their review and decision. At its regular monthly session in April of 2014, the Attorney Grievance Commission determined that you failed to file a timely answer to

this Request for Investigation.  Your conduct violated MCR 9.104(1)-(4);[3] and MRPC 9.113,[4] and 8.4(a) and (c).[5]

(*Id.*)  All of these grounds appear to relate to Shulman's failure to answer Defendant's complaint and do not reflect a finding that he was acting under a conflict of interest.[6]  Either way, the Michigan Attorney Grievance Commission's conclusions would not control this Court's disposition of Defendant's motion.  *United States v. Kilpatrick* 798 F.3d 365, 375 (6th Cir. 2015) ("The constitutional question we must answer is not whether [the defendant]'s attorneys violated ethical rules, but whether an actual conflict existed that adversely affected their performance.").

---

[3] Michigan Court Rule (MCR) 9.104 provides in relevant part:

> The following acts or omissions by an attorney . . . are misconduct and grounds for discipline, whether or not occurring in the course of an attorney-client relationship:
>
> (1) conduct prejudicial to the proper administration of justice;
> (2) conduct that exposes the legal profession or the courts to obloquy, contempt, censure, or reproach;
> (3) conduct that is contrary to justice, ethics, honesty, or good morals;
> (4) conduct that violates the standards or rules of professional conduct adopted by the Supreme Court[.]

[4] There is no Michigan Rule of Professional Conduct (MRPC) 9.113, so the Court believes the Commission intended to reference Michigan Court Rule (MCR) 9.113, which provides that a failure to answer a request for investigation constitutes misconduct.

[5] Michigan Rule of Professional Conduct 8.4(a) provides that it is professional misconduct to "violate or attempt to violate the Rules of Professional Conduct[.]"  Michigan Rule of Professional Conduct 8.4(c) provides that it is professional misconduct to "engage in conduct that is prejudicial to the administration of justice[.]"

[6] Conflicts of interest--generally--and conflicts of interest--related to a former client specifically--are governed by Michigan Rules of Professional Conduct 1.7 and 1.9, respectively.  The letter of admonition mentions neither of those rules, nor does it mention conflicts of interest at all.

### 2. The Alleged Adverse Effects of Shulman's Alleged Conflict of Interest

Defendant enumerates several instances in which he believes Shulman's performance was adversely affected by a conflict of interest. The first set of instances relate to Shulman's performance before trial. First, Defendant objects to Shulman's failure to file pretrial motions to dismiss the indictment and for a bill of particulars. (Dkt. 2713, at 40.) Second, Defendant argues that Shulman was ineffective for failing to properly challenge the search and seizure at the 8-mile clubhouse. (*Id.*) Third, Defendant claims that Shulman was ineffective for failing to timely move to dismiss Count Thirteen of the second superseding indictment, which charged Defendant with conspiracy to murder. (*Id.* at 42.) Fourth, Defendant argues that Shulman devoted too little time to meeting with him. (*Id.* at 40-41.) Fifth, Defendant asserts that Shulman never advised him about the elements of the offenses against him and never meaningfully pursued a plea resolution, despite Defendant's informing Shulman he wanted to resolve the case through a plea. (*Id.* at 41.) Sixth, Defendant objects to Shulman's failure to reply to Rule 29 and 33 motions. (*Id.* at 43.)

The next set of instances relate to Shulman's performance during trial. First, Defendant claims that Shulman "refused to cross Agent Brzezinski or any of the other government witnesses to show that Mr. Ball had nothing to do with Randy McDaniel, David Foster, or the retagging of motorcycles with Great Lakes Choppers Titles." (*Id.* at 34.) Second, Defendant claims that Shulman "refused to cross-examine Brzezinski or take any other steps . . . to establish that nowhere in the FBI reports, NICB, [sic] Neal Wisner's reports, or the Michigan State Police reports . . . was there any indication whatsoever that

Mr. Ball was involved [with Randell McDaniel, David Foster, or Great Lakes Choppers]." (*Id.* at 35.) Third, Defendant claims that Shulman was ineffective for failing to call Jose Valle, who told Defendant that McDaniel had sold him a stolen motorcycle, to testify. (*Id.* at 35-36.) Fourth, Defendant claims that Shulman was ineffective for failing to contact Eugene Trumph, who "would have had solid proof that Mr. Ball had nothing whatsoever to do with any stolen motorcycle scheme, and certainly not the stolen motorcycle scheme attributed to Mr. Ball at trial and sentencing." (*Id.* at 36.) Fifth, Defendant claims that Shulman was ineffective in his cross-examination of Robert Burton. (*Id.* at 36-39.) Sixth, Defendant claims that Shulman was ineffective in his cross-examination of Ricky Frank. (*Id.* at 39.) Seventh, Defendant claims that Shulman was ineffective in his cross-examination of Neal Wisner. (*Id.* at 41.) Eighth, Defendant argues that Shulman should have objected to the use of Detroit Police Officer Benito Mendoza to transport witnesses in this case. (*Id.* at 42.) Finally, Defendant argues that Shulman should have objected to the 10 day adjournment the Court took after the close of the government's case to attend a Judicial Conference. (*Id.* at 42.)

The next set of instances relate to Shulman's performance during sentencing. Defendant alleges that Shulman was ineffective for failing to raise objections to the following: (1) the government's loss calculation; (2) the prosecutor's representations regarding the value of the motorcycles Ball was responsible for stealing; (3) the prosecutor's claim concerning Defendant's role at the "8-Mile Clubhouse"; (4) the prosecutor's attribution of certain drugs to Defendant; and (5) the Court's attribution to Defendant of dealing in cocaine base. (*Id.* at 41, 43.)

### C. Alleged Prosecutorial Misconduct

Defendant alleges prosecutorial misconduct in numerous forms. First, Defendant argues that the Government failed to disclose the alleged conflicts of interest affecting O'Brien and Shulman. Second, Defendant argues that the Government failed to provide him discovery to which he was entitled under *Brady v. Maryland* and *Giglio v. United States*. (*Id.* at 47.) The allegedly improperly withheld materials relate to: (1) McDaniel's deals and cooperation; (2) Aref Nagi's work as an informant and cooperating witness; and (3) Doug Burnett's cooperation with the Government. (*Id.* at 47-48.)

Third, Defendant alleges that the Government either directed or benefitted from attorney Steve Vitale's eliciting information from Defendant under false pretenses while Defendant was incarcerated before trial. (*Id.* at 48.) Finally, Defendant alleges that the Government falsely represented information before the grand jury, during trial, and during sentencing. (*Id.* at 48-50.)

## II.   Applicable Standards

18 U.S.C. § 2255 movants are not automatically entitled to discovery. Under Rule 6(a) of the Rules Governing § 2255 Proceedings, a court may permit discovery if, within the exercise of its discretion, it finds good cause for discovery. *Thomas v. United States*, 849 F.3d 669, 680 (6th Cir. 2017). Good cause exists "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief." *Id.* Rule 6 does not "sanction fishing expeditions based on a petitioner's conclusory allegations." *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004). "[T]he petitioner must set forth

specific allegations of fact." *Id.* And "[t]he burden of demonstrating the materiality of information requested is on the moving party." *Id.*

Before addressing whether Defendant is entitled to discovery to support his § 2255 motion, this Court must first identify the "essential elements" of his claims. *Bracy v. Gramley,* 520 U.S. 899, 904 (1997). As a general matter, for a § 2255 movant to succeed, he must demonstrate either: "(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001) (citing *United States v. Addonizio*, 442 U.S. 178, 185-86 (1979)). While those categories encompass many claims, not every asserted deficiency in proof or error of law is cognizable in a § 2255 proceeding.

For example, "[i]t is well-established that a § 2255 motion 'is not a substitute for direct appeal.'" *Ray v. United States*, 721 F.3d 758, 761 (6th Cir. 2013) (citations omitted). "[C]laims that could have been raised on direct appeal, but were not, will not be entertained via a motion under § 2255 unless the petitioner shows: (1) cause and actual prejudice to excuse his failure to raise the claims previously; or (2) that he is 'actually innocent' of the crime." *Id.* (citing *Bousley v. United States*, 523 U.S. 614, 622 (1998). And "it is equally well settled that a § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law." *Jones v. United States*, 178 F.3d 790, 796 (6th Cir. 1999). Consistent with these principles, the Sixth Circuit "has repeatedly held that the sufficiency of the evidence to support a conviction may not be collaterally reviewed on a Section 2255

proceeding." *United States v. Ocampo*, 919 F. Supp. 2d 898, 914 (E.D. Mich. 2013) (citations omitted).

As the Court addresses each discovery request below, it will review the essential elements of Defendant's claims with more specificity.

## III. Analysis

Defendant has requested leave to file 69 requests for discovery. These requests spans several topics, which the Court addresses in turn.[7]

### A. Discovery Related to Shulman's Alleged Conflict of Interest

Requests 1-28 relate to Defendant's claim that Shulman provided ineffective assistance of counsel due to a conflict of interest. Generally, when a defendant asserts that he received ineffective assistance of counsel, he must demonstrate that (1) counsel performed deficiently and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To demonstrate deficient performance, a defendant must "show[] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* To demonstrate prejudice, he must "show[] that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

But when a defendant asserts ineffectiveness of counsel arising from a conflict of interest, prejudice is presumed if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected

---

[7] The Court's grouping of the requests is not completely congruent with Defendant's.

his lawyer's performance.[8] *Id.* at 692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980)). To demonstrate that a conflict of interest adversely affected counsel's performance, a defendant must show that counsel's conflict influenced his basic strategic decisions. *Jalowiec v. Bradshaw*, 657 F.3d 293, 317 (6th Cir. 2011). That is, the defendant must show that his attorney made a choice between alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other. *Id.* "The existence of an adverse effect is more likely to be evident in cases in which an attorney takes positive steps on behalf of one client prejudicial to another than in cases in which the attorney's actions are based on inaction and are passive. *Id.* (quoting *McFarland v. Yukins*, 356 F.3d 688, 706 (6th Cir. 2004)).

Request 1, seeking a copy of the agreement between McDaniel and the United States to dismiss the indictment against McDaniel in this case, is GRANTED because it may demonstrate the active representation of conflicting interests or that a conflict of interest adversely affected Shulman's representation. The Government may redact any portions necessary to protect the safety of unrelated parties.

Request 2, seeking a copy of the agreement between McDaniel and the United States to adjourn his sentencing date in McDaniel's other federal case, is GRANTED because it may demonstrate the active representation of conflicting interests or that a conflict of interest adversely affected Shulman's representation.

---

[8] None of the analysis herein reflects a finding that Defendant's counsel either "represented conflicting interests" or that "an actual conflict of interest adversely affected" his performance. The Court may still decide that the *Strickland* standard for general ineffectiveness claims--rather than the *Cuyler* standard for conflict of interest claims-- applies to Defendant's claims regarding Shulman's representation.

Request 3, seeking an admission that McDaniel provided information to the Government related to this case while this case was pending and while represented by Shulman, is GRANTED because it may demonstrate the active representation of conflicting interests or that a conflict of interest adversely affected Shulman's representation.

Request 4, seeking an admission that Shulman represented McDaniel during the same period he represented Defendant, is GRANTED because it may demonstrate the active representation of conflicting interests or that a conflict of interest adversely affected Shulman's representation.[9]

Request 5, seeking disclosure of the date, time, and place of any debriefings of McDaniel in relation to *United States v. $463,497.72*; *People v. McDaniel*, 07-03606FY; MSP CID Monroe Narcotics OMNI, OMM-0000052-08 (02) & OMA 0000043-06 or "any other case," is GRANTED IN PART and DENIED IN PART. Defendant may only seek disclosures related to debriefings that occurred while this case was pending and while represented by Shulman. Defendant has not shown how debriefings outside that time period are material. Furthermore, the Government may redact any portions necessary to protect the safety of unrelated parties.

Request 6, seeking "any and all reports generated as part of the investigation(s) in any case against McDaniel, including the names and title of all state and federal

---

[9] The Government appears to have answered this request already, however, stating: "The Government can also aver that the FBI case agent never interviewed Mr. McDaniel as part of his investigation and both the undersigned and the case agent are unaware of any attempts by McDaniel to cooperate, at any time, with law enforcement in their investigation of the Detroit Highwaymen Outlaw Motorcycle Club." (Dkt. 2868, at 18.)

investigators that took part in the investigation, or interviewed McDaniel," is DENIED. Defendant has not shown how this incredibly broad request is material.

Request 7, seeking "any and all agreement(s) by any state or federal agencies [to] dismiss or reduce any charges pending against Randy McDaniel at any time and a list of all arrest contacts and questioning of McDaniel on any matter," is DENIED. Defendant has not shown how this incredibly broad request is material.

Request 8, seeking any and all communications between Shulman and any employee of the Government regarding McDaniel, Defendant, the Highwaymen Motorcycle Club, or any of its members, is GRANTED because it may demonstrate the active representation of conflicting interests or that a conflict of interest adversely affected Shulman's representation.

Request 9, seeking any and all documents, reports, or raw notes in the possession of the Michigan State Police as to any and all meetings with or interviews of McDaniel conducted by the Michigan State Police or in their presence, is GRANTED because it may demonstrate the active representation of conflicting interests or that a conflict of interest adversely affected Shulman's representation. The Government may redact any portions necessary to protect the safety of unrelated parties.

Request 10, seeking any and all documents, reports, or raw notes in the possession of the Brownstown Police Department, generated as part of this investigation, as to any and all interviews of McDaniel, conducted by the Brownstown Police Department, is GRANTED because it may demonstrate the active representation of conflicting interests or that a

conflict of interest adversely affected Shulman's representation. The Government may redact any portions necessary to protect the safety of unrelated parties.

Request 11, seeking any and all documents/ reports in the possession of NICB Neal Wisner as to any and all meetings with or interviews of McDaniel conducted by or in the presence of NICB Neal Wisner, is GRANTED because it may demonstrate the active representation of conflicting interests or that a conflict of interest adversely affected Shulman's representation. The Government may redact any portions necessary to protect the safety of unrelated parties.

Request 12, seeking materials generated as part of the investigation provided by Detroit Police Officer Benito Mendoza as to any and all meetings and interviews of McDaniel that were conducted by or in the presence of Officer Mendoza, is GRANTED[10] because it may demonstrate the active representation of conflicting interests or that a conflict of interest adversely affected Shulman's representation.

Request 13, asking how many stolen motorcycles with Great Lakes Choppers Titles have been recovered in connection with investigations into or the case brought against McDaniel and David Foster, is GRANTED because it may demonstrate the active representation of conflicting interests or that a conflict of interest adversely affected Shulman's representation.

Request 14, seeking all DEA 6s, reports, documents, and raw notes regarding McDaniel related to the cases mentioned in Request 5 (and any others), is GRANTED

---

[10] This request appears to be encompassed by Request 9, which was already granted.

because it may demonstrate the active representation of conflicting interests or that a conflict of interest adversely affected Shulman's representation.

Request 15, seeking an admission that Anthony Clark and McDaniel were confined together during some portion of 2011 to 2015, is DENIED. Defendant has not demonstrated how such confinement, which would have taken place after Defendant's trial, is material to Shulman's representation. Anthony Clark's name does not even appear in Defendant's substantive briefing.

Request 16, seeking materials related to Brzezinski's Grand Jury Testimony related to the indictment of McDaniel in Count Fifteen, is GRANTED because it may demonstrate the active representation of conflicting interests or that a conflict of interest adversely affected Shulman's representation.

Request 17, seeking disclosure of the Rule 11 Plea Agreement as to McDaniel in his other federal criminal case, is GRANTED. The Court has reviewed this material *in camera* and determined that it may demonstrate the active representation of conflicting interests or that a conflict of interest adversely affected Shulman's representation. The Government may redact any portions necessary to protect the safety of unrelated parties.

Requests 18 and 19, seeking materials related to Michigan State Police Incident No. OMM-0000158-08(02), are GRANTED because they may demonstrate the active representation of conflicting interests or that a conflict of interest adversely affected Shulman's representation.

Request 20, seeking disclosure of "the identity of any law enforcement officer about whom McDaniel provided information to federal or state authorities and ... the nature of that

information," is DENIED because Defendant has not demonstrated how this request is material to his conflict of interest argument.

Request 21, seeking any and all documents generated as part of the investigation into how many motorcycles have been recovered in Michigan that were stolen from Myrtle Beach, South Carolina during Bike Week, May 2006, is GRANTED. This material may demonstrate the active representation of conflicting interests or that a conflict of interest adversely affected Shulman's representation.

Request 22, seeking a "current" list of Neal Wisner's spread sheet that he and his coworkers prepared as part of the investigation of motorcycles stolen from Myrtle Beach in May 2006, is GRANTED because it may demonstrate the active representation of conflicting interests or that a conflict of interest adversely affected Shulman's representation.

Requests 23 and 24, seeking any and all documents/ reports that reflect at whose behest and on whose behalf Special Agent Brzezinski inspected the 1987 Harley Davidson Motorcycle, VIN-1HD1BKL14HY010959, are DENIED. Defendant has not articulated, let alone demonstrated, how this request relates to his conflict of interest claim.

Request 25, seeking all communications between the Government and law enforcement agencies in Florida regarding the Petition for Injunction for Protection Against Repeat Violence Case No. 10-DR-000934, is DENIED. Defendant's briefs do not even reference this matter, so it is unclear how these requests are material.

Request 26, which seeks any and all documents, reports, minutes, or raw notes in the possession of the NICB generated by Neal Wisner or by any other employee of the NICB

regarding Michigan State Police Incident No. OMM-0000158-18, is GRANTED because it may may demonstrate the active representation of conflicting interests or that a conflict of interest adversely affected Shulman's representation.

Request 27, seeking an admission that the Government directed certain testimony from Ricky Frank, is GRANTED. This material may demonstrate the active representation of conflicting interests or that a conflict of interest adversely affected Shulman's representation.

Request 28, seeking all evidence that Ricky Frank's motorcycle had its VIN numbers ground out and replaced, is GRANTED. This material may demonstrate the active representation of conflicting interests or that a conflict of interest adversely affected Shulman's representation.

**B. Discovery Related to O'Brien's Alleged Conflict of Interest**

Requests 29-30 relate to Defendant's claim that O'Brien was operating under a conflict of interest while he represented Defendant between October 2006 and May 2008. As explained above, there is good cause for allowing discovery related to an alleged conflict of interest only if the facts sought, if fully developed, would demonstrate that counsel was actively representing conflicting interests or that an actual conflict of interest adversely affected his performance. *Cuyler*, 446 U.S. at 350.

Request 29, which seeks any written documents or references to oral communications related to the Government's October 24, 2011 motion to dismiss the indictment against O'Brien, is overbroad and seeks irrelevant information insofar as it seeks communications far beyond the date when this Court terminated O'Brien's representation.

As a result, this request is GRANTED IN PART and DENIED IN PART. Defendant may only seek materials related to the Government's decision not to prosecute O'Brien if they preceded O'Brien's termination as Defendant's attorney.

Request 30, which seeks the source mentioned by Brzezinski in the FBI 302 from August 2005, is DENIED because Defendant has not demonstrated how it is material to O'Brien's performance as counsel between October 2006 and May 2008.

### C. Discovery Related to Aref Nagi's Alleged Cooperation with the Government

The third group of discovery requests (31-36) relate to Defendant's allegation that the Government failed to disclose to him that his co-defendant at trial, Aref Nagi, had worked as a government informant and cooperating witness for law enforcement authorities and prosecutors in both the state (Michigan) and federal systems. (Dkt. 2713, at 47.) Defendant has not tied this claim to a specific legal theory that would entitle him to relief, but the following two theories seem most likely.

First, Defendant may be arguing that the Government's failure to disclose this information entitles him to relief under *Brady*. (*Id.*) "Under *Brady*, [the defendant] must show that the Government failed to share evidence favorable to the accused, and that the suppression of evidence prejudiced the defendant." *Thomas*, 849 F.3d at 680. Alternatively, Defendant may be arguing that the Government violated his Sixth Amendment guarantee to a fair adversarial criminal process. *See United States v. Cronic*, 466 U.S. 648, 656 (1984). "[I]n order to establish a violation of the Sixth Amendment right to counsel ensuing from government surveillance, a claimant must not only show that conversations with an attorney were surreptitiously monitored, but must also show that the

information gained was used to prejudice the claimant's defense in his criminal trial."

*United States v. Collins*, 799 F.3d 554, 591 (6th Cir. 2015) (quoting *Sinclair v. Schriber*, 916 F.2d 1109, 1112 (6th Cir. 1990)). The Sixth Circuit has identified a number of factors bearing on whether a defendant's Sixth Amendment rights have been violated by an "invasion of the attorney-client privilege," including:

> 1) whether the presence of [an] informant was purposely caused by the government in order to garner confidential, privileged information, or whether the presence of [an] informant was the result of other inadvertent occurrences; 2) whether the government obtained, directly or indirectly, any evidence which was used at trial as the result of the informant's intrusion; 3) whether any information gained by the informant's intrusion was used in any other manner to the substantial detriment of the defendant; and 4) whether the details about trial preparations were learned by the government.

*Collins*, 799 F.3d at 591 (citations omitted).

In light of these elements, Request 31 is GRANTED IN PART and DENIED IN PART. The request for an admission that Nagi worked as a cooperating witness, source of information, or informant for the federal government, as well as information regarding when his cooperation ended, appears to be material to either a Sixth Amendment claim or a *Brady* claim. Accordingly, that portion of Request 31 is GRANTED. Defendant's other request for "any and all information on [Nagi's] work for the local, state and federal government" is overbroad, however, and is DENIED for lacking both the requisite specificity and any apparent materiality. *Williams*, 380 F.3d at 974 (stating that a § 2255 movant must "set forth specific allegations of fact," and that "[t]he burden of demonstrating the materiality of information requested is on the moving party."). Defendant has not demonstrated how "any and all" information related to Nagi's alleged work as an informant would help Defendant show that he is entitled to relief. The particulars of Nagi's alleged work as an

informant in the early 1990s, for example, do not appear relevant to Defendant's § 2255 motion.

Request 32 is also GRANTED IN PART and DENIED IN PART.  Like a portion of the previous request, the request for "any and all file(s)" regarding Nagi's opening, closing, and work as an informant, confidential source, and cooperating witness is DENIED because it lacks both the requisite specificity and any apparent materiality.  *Williams*, 380 F.3d at 974.  However, the request to disclose whether there was any attempt from Nagi or his counsel or discussion with either of them about cooperating with the U.S. Attorney's Office in connection with or immediately prior to or during the pendency of the underlying criminal matter is GRANTED because it is material to a Sixth Amendment claim or a *Brady* claim.[11]

Request 33, seeking "any and all documents/reports generated June 2007 through December 2007, as part of this investigation, state or federal, involving the second seizure of [a particular motorcycle] as to Agent Brzezinski's testimony," is DENIED.  Defendant has not articulated how this request is related to Nagi's alleged work as a cooperating witness, source of information, or informant for the federal government.  Therefore, Defendant has failed to carry his burden of demonstrating its materiality.

---

[11] The Government appears to have already answered this request, however, stating: "[T]he government can aver that the case agent never interviewed Mr. Nagi as part of his investigation and both the undersigned and the case agent are unaware of any attempts by Nagi to cooperate, at any time, with law enforcement in their investigation of the Detroit Highwaymen Outlaw Motorcycle Club."  (Dkt. 2868, at 6-7.)

Request 34, requesting the name of the Assistant United States Attorney(s) with whom Nagi entered into a cooperation agreement, is GRANTED. It may provide information material to either a Sixth Amendment claim or a *Brady* claim.

Requests 35 and 36, which seek information related to an affidavit provided by Nagi's attorney, James Thomas, have no bearing on Defendant's alleged grounds for relief.[12] Therefore, these requests are DENIED.

### D. Discovery Related Doug Burnett's Cooperation with the Government

Requests 37-40, which relate to disclosures the Government allegedly did not make regarding witness Doug Burnett, are DENIED. "Under *Brady*, [the defendant] must show that the Government failed to share evidence favorable to the accused, and that the suppression of evidence prejudiced the defendant." *Thomas*, 849 F.3d at 680. The trial record reflects an extensive cross-examination of Burnett, so even if the facts sought were established, it does not appear that Defendant could show that his defense was prejudiced. There is accordingly no good cause for granting these requests.

### E. Discovery Related to Prosecutorial Misconduct Regarding Count Thirteen

Requests 41-46 relate to Defendant's claim that the Government committed prosecutorial misconduct with regard to Count Thirteen (conspiracy to murder).[13] The Sixth Circuit already rejected this argument on direct appeal in *United States v. Nagi*, 541 F. App'x 556, 569 (6th Cir. 2013), *writ of certiorari denied*, 134 S.Ct. 1804. And "[i]t is well-settled that a § 2255 motion may not be employed to relitigate an issue that was raised and

---

[12] For example, whether Nagi actually helped quell a prison riot is irrelevant.

[13] This is an instance where the Court's categorization differs from Defendant's.

considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law." *Jones*, 178 F.3d at 796. Given that the Court cannot identify any "highly exceptional circumstances" for reconsidering this issue, there is no good cause for granting these requests. They are accordingly DENIED.[14]

## F. Discovery Related to Whether Benito Mendoza is a Corrupt Officer Who Acted Against Defendant to Protect His Friends and Associates

Requests 47-66 relate to Defendant's claim that "[Benito] Mendoza is a corrupt law enforcement officer who acted against him in this case in order, among other reasons, to protect his own friends and associates[.]" (Dkt. 2859, at 30.) In his briefing, Defendant asserts in a conclusory fashion that Mendoza "has been identified as a corrupt law enforcement officer," and that Defendant "believes that he was discussing witnesses' testimony with them while transporting them." (Dkt. 2655, at 36; Dkt. 2713, at 42.) Defendant argues that the discovery sought is relevant to his claim of prosecutorial misconduct. (*See* Dkt. 2713, at 42.)

The Court concludes that there is no good cause for granting these requests. Defendant attempts to substantiate these allegations with his own conclusory affidavit, as well as an affidavit from co-defendant Gary Eizak, which states that Mendoza has lied about the facts involved in this case "as he has over the years" in order to protect his friends and associates. (Dkt. 2722-2.) But ultimately these requests reek of the type of

---

[14] Even if Defendant could relitigate this issue, he has not shown how these requests might establish that his confinement is unconstitutional. For example, Defendant has not demonstrated how Request 46, which seeks an admission "that the government has been monitored [sic] emails and phone calls between Ball's [sic] and his attorney (the undersigned)," might advance his § 2255 claims.

fishing expedition that the Sixth Circuit has instructed district courts not to permit through Rule 6 discovery. This is particularly so in light of Defendant's argument that the requests are "highly relevant both to this case and ... corruption that has characterized Mendoza's work *beyond just this case*." (Dkt. 2859, at 30 (emphasis added).) Mendoza's work outside this case has no bearing on Defendant's entitlement to relief under § 2255, and Defendant's allegations are conclusory, *ad hominem* attacks without support in evidence. They are accordingly DENIED.[15]

### G. Discovery Related to the Seizure at the "8-Mile Clubhouse"

Requests 67-68 relate to Defendant's allegation that Assistant United States Attorney Diane Marion, in seeking a four-point leadership role increase in Defendant's sentencing guidelines, falsely represented that property referred to as the 8-Mile Clubhouse was used as a center for Defendant to distribute illegal drugs. But Defendant has not articulated, let alone demonstrated, how he would be entitled to relief under § 2255 even if he could prove the truth of this allegation. As a result, Defendant has failed to carry his burden of demonstrating the materiality of these requests, and they are DENIED.[16]

---

[15] The Court has reviewed Defendant's supplemental brief (Dkt. 2880), which he filed after the May 17, 2017 hearing, and it does not alter the Court's conclusions. Therein, Defendant attempts to salvage Requests 47-66 by (1) continuing to litigate the details of an incident *not charged to him* (the "Bridge Bar Incident") and (2) referring generically to "the significance of a defense which challenges the integrity of the investigation." (*See id.* at 2.) Neither effort changes the fact that Defendant has not carried his burden of showing how the discovery sought, if fully developed, would demonstrate that he is entitled to relief.

[16] The Court also notes that Defendant's counsel expressly raised this issue during the sentencing hearing, objecting that "[n]obody puts him in the Detroit clubhouse at that time, at all." (Dkt. 1969, at 15.) And the Court accepted that objection. (*See id.* ("I won't score it. . . . As my father used to say to me, once you've won your argument, stop arguing).)

## H. Discovery Related to the Verity of Chris Miller's Testimony

Request 69 seeks all documents related to debriefings or interviews with government witness Chris Miller, who Defendant claims fabricated testimony. Defendant states in a conclusory manner that this discovery relates to "another example of government misconduct." (Dkt. 2859, at 33.) When a defendant alleges prosecutorial misconduct unrelated to a particular constitutional provision, the "relevant question [] is whether the prosecutorial conduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Frazier v. Huffman*, 343 F.3d 780, 791 (6th Cir. 2003) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Determining whether conduct meets this standard involves two steps. First, the court determines whether the conduct about which the defendant complains was improper. *Frazier*, 343 F.3d at 791. Then, a four-factor test applies to any conduct found to be inappropriate: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *Id.*

Defendant never explains how the requested information, if fully developed, would demonstrate that he is entitled to relief. Nor does either of Defendant's § 2255 briefs, which total seventy pages, even mention Chris Miller. Therefore, Defendant has not carried his burden of demonstrating the materiality of the discovery sought, and this request is DENIED.

**IV. Conclusion**

For the foregoing reasons, Defendant's motion for discovery is GRANTED IN PART

and DENIED IN PART.  Upon issuance of this order, the Government has twenty-one (21)

days to respond consistently with the conclusions herein.

SO ORDERED.

S/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  May 25, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of
record on May 25, 2017, by electronic and/or ordinary mail.

S/Carol J. Bethel
Case Manager