UNITED STATES OF AMERICA,

        Plaintiff,

Case No. 06-20465

v.

Honorable Nancy G. Edmunds

GARY BALL, JR.,

        Defendant.

_____/

**OPINION AND ORDER DENYING DEFENDANT'S 28 U.S.C. § 2255 MOTION [2655]**

Defendant Gary Ball moves under 28 U.S.C. § 2255 to vacate his sentence, asserting several grounds for relief. First, he maintains that two of his attorneys, Lee O'Brien and Lawrence Shulman, deprived him of his right to representation free from conflicts of interest. Defendant argues that O'Brien was conflicted because he was the subject of a criminal investigation that was conducted by the same prosecuting authority, involved the same case agent, and included allegations that O'Brien participated in some of the conduct charged to Defendant in this case. Defendant argues that Shulman's conflict arose from his representation of Randell ("Randy") McDaniel, who was ultimately indicted in this case on one of the same counts as Defendant. Next, Defendant claims that he received ineffective assistance during pretrial, trial, and appeal, regardless of conflicts. Finally, he alleges various forms of prosecutorial misconduct, as well as a failure by this Court to fulfill its duty to inquire into potential conflicts.

The Court has permitted discovery, held an evidentiary hearing, and received extensive briefing in this matter. For the reasons below, Defendant's motion is DENIED.

## I.    Background

Below are most of the facts and allegations related to Defendant's § 2255 claims. When this Court reaches the merits of Defendant's motion, it will introduce additional facts as necessary to resolve the claims.

### A. Defendant's Representation by Lee O'Brien and the Investigation of O'Brien

Defendant was a member of the Highwaymen Outlaw Motorcycle Gang, and this case arises out of the investigation and prosecution of members of that gang. The initial Indictment in this case was filed under seal on September 6, 2006. (Dkt. 2.) Therein, Defendant was indicted as one of 17 defendants for conspiracy to possess with intent to distribute cocaine, marijuana, and ecstasy. (Dkt. 3.) On October 3, 2006, the indictment was unsealed, and Defendant made his initial appearance, represented by Lee O'Brien. (Dkt. 1.) O'Brien remained Defendant's attorney of record from that date until May 8, 2008, when this Court terminated his representation. (Dkt. 166.)

On August 4, 2005, fourteen months before O'Brien appeared on Defendant's behalf, Special Agent Edward Brzezinski reported the following in an FBI 302: "The source advise [sic] that GARY BALL resides in a condominium that is owned by LEE O'BRIEN, who is an attorney at Jeffrey Figor's (phonetic) law firm. The source was told that O'BRIEN drinks a lot of alcohol and is 'hooked on' cocaine, which he gets from GARY BALL." (Dkt. 2722-1, at 2.) One month later, Brzezinski reported in another FBI 302 that O'Brien was one of the "attorneys that represent a lot of the Highwaymen Outlaw Motorcycle Gang (HOMG) members," as well as a "big dope addict[]" who associated with the Highwaymen on a regular basis, although not a patched member. (*Id.* at 4.)

In November 2007, which was two years after the 302s and thirteen months after O'Brien appeared on Defendant's behalf, Brzezinski and the Downriver Auto Theft Taskforce went to Todd Sullivan's body shop. (Dkt. 2722-1, at 7-8.) There, Brzezinski found a re-tagged, stolen Camaro. (*Id.*) According to Brzezinski's grand jury testimony, Sullivan claimed that the Camaro belonged to O'Brien and that he had purchased it from O'Brien. (*Id.* at 8.) Brzezinski further testified that the following exchange with O'Brien occurred soon after:

> [I] ran into Lee O'Brien at the courthouse. And the first thing he came up to me and said, "I don't own that car." I said, "I never said you did." I said, "Do you know Todd Sullivan?" "No, I don't know Todd Sullivan. I didn't know who Todd Sullivan was until two days ago." I said, "He never paid you for a car?" He said, "Well, no, I sold the car, but I don't know Todd, I never met with him, never even talked to the guy, never even been in his shop."

(*Id.*)

O'Brien, through an affidavit, has offered his account of this exchange. (Dkt. 2795-1, at 11-12.) He avers that, "on or about November of 2007," while he was representing Michael Newberry in state court, Brzezinski became frustrated with Newberry's unwillingness to cooperate with authorities and accused O'Brien of selling a stolen Camaro.[1] (Dkt. 2795, at 11.) O'Brien further avers that "[s]ometime thereafter, I received a call from Brzezinski advising me that he had a warrant for my arrest on a claim that I had made a False Statement to a Federal Officer." (*Id.*) O'Brien then concludes: "I say without hesitation that I was not able to enter into any meaningful plea negotiations on behalf of [Defendant] . . . based on my concerns arising from Brzezinski's threats against me

---

[1] A Declaration from Newberry similarly avers that when O'Brien told Brzezinski that Newberry would not provide information, "Brzezinski and O'Brien began arguing, and I heard FBI Agent Brzezinski telling O'Brien that he (Brzezinski) was going to indict attorney O'Brien on a stolen car charge." (Dkt. 2795-1, at 13.)

personally, and finally from his call advising me he had a warrant against me." (*Id.* at 11-12.) O'Brien does not aver that he learned of the aforementioned 302s during his representation of Defendant. (*See id.*)

Four months after that exchange, on March 12, 2008, O'Brien was charged via federal complaint with false statements in connection with possession of the re-tagged, stolen Camaro. (Dkt. 2722-1, at 11 (Dkt. 1 in 08-mj-30123).) Nine days later, this Court set a hearing to discuss getting Defendant a new attorney. (Dkt. 160.) On May 8, 2008, this Court terminated O'Brien's representation of Defendant, prior to any motion cut-off or trial date. (Dkt. 166.)

One year after O'Brien's termination, on May 14, 2009, the First Superseding Indictment was unsealed. (Dkt. 198.) It charged Defendant with additional counts of substantive RICO (Count One); RICO conspiracy (Count Two); conspiracy to commit murder in aid of racketeering (Count Thirteen); conspiracy to transport stolen property in interstate commerce (Count Fifteen); and conspiracy to possess with intent to distribute, and distribution of, cocaine (Count Twenty). The original controlled substance conspiracy charged to Defendant in the original Indictment became Count Nineteen in this First Superseding Indictment. O'Brien was not charged in the First Superseding Indictment.

Seven months later, on December 15, 2009, the Second Superseding Indictment was filed. (Dkt. 997.) Therein, Defendant was charged with an additional count of conspiracy to alter, remove, or obliterate vehicle identification numbers (Count Thirty-Six). O'Brien was also charged in the Second Superseding Indictment with a single count of false statements (Count Forty-Four). This count was based on the same misconduct for which O'Brien was originally charged on March 12, 2008 and superseded the charge in 08-mj-30123.

4

On April 1, 2010, twenty-three months after O'Brien's representation was terminated, Defendant went to trial. On October 24, 2011, the Government filed a motion and brief to dismiss the Second Superseding Indictment as to O'Brien. (Dkt. 2240.) That same day, the Court entered an order of dismissal as to O'Brien. (Dkt. 2245.)

## B. Lawrence Shulman's Representation of Defendant and Randy McDaniel

Lawrence Shulman became counsel of record for Defendant on June 17, 2008, and he represented Defendant through trial, sentencing, and the start of appeal. On the date Shulman began representing Defendant, Randy McDaniel had not been indicted in this case.

Three months earlier, in March 2008, Shulman made an appearance as counsel for McDaniel in a Michigan state criminal case, People v. McDaniel, 07-03606-FY ("the state court case"). (Dkt. 2722-1, at 25.) There, McDaniel was indicted on a variety of counts related to stealing and re-tagging vehicles. (*See id.* at 27-30.) As the Michigan Court of Appeals recounted, McDaniel was charged with conducting a criminal enterprise based on the following alleged predicate incidents:

> (1) a 2001 conviction for receiving and concealing stolen property over $20,000; (2) violating MCL 750.535a by operating a chop shop on or about October 16, 2006; (3) violating MCL 750.535(7) by buying, receiving, possessing, concealing or aiding in the concealment of a Yamaha four-wheeler, Vehicle Identification Number (VIN) JY411007H0004823, for financial gain, knowing or having reason to know it was stolen; (4) violating MCL 750.535(7) by buying, receiving, possessing, concealing or aiding in the concealment of a Harley-Davidson Screaming Eagle motorcycle, VIN ULT6891ST00002849, for financial gain, knowing or having reason to know that it was stolen.

*People v. McDaniel*, No. 290689, LC No. 07-036304-FH, at 3 n.1 (Mich. Ct. App. Sept. 30, 2010). In his submissions to the Court, Defendant emphasizes that Counts 3 and 4 of the

state court indictment specifically alleged the concealment of two 2005 Great Lakes Choppers. (Dkt. 2722-1, at 28; Dkt. 2883, at 3.)

One month after Shulman appeared as counsel for McDaniel in the state court case, on April 9, 2008, case investigators, including Brzezinski, held a coordination meeting, where they received "an update on the [state] prosecution of Highwaymen Randell McDaniel." (Dkt. 2795-1, at 16.) NICB Neal Wisner's notes from this meeting document a discussion of McDaniel's retaining a "new defense attorney, a Lawrence Shulman." (*Id.*) The notes also reflect that Brzezinski "assured the group that McDaniel will be indicted to face federal criminal charges no matter what happens in Monroe County Circuit Court." (*Id.*) Finally, Wisner notes the growing body of evidence that "Randy McDaniel was the king of VIN alterations for [the Highwaymen] in Michigan." (*Id.* at 17.)

As stated above, Shulman appeared for Defendant in this case on June 17, 2008. Immediately after, Shulman filed a motion for revocation of Defendant's detention order, which was granted on June 26, 2008. (Dkt. 174; Dkt. 176.)

Later that year, McDaniel was convicted in the state court case of conducting a criminal enterprise and operating a motor vehicle chop shop. (*See* Dkt. 2765, at 12.) He was sentenced on October 13, 2008. (*See id.*) Shulman remained McDaniel's counsel of record during the appeal, joined by John Signorino. (Dkt. 2795, at 2.)

On January 29, 2009, McDaniel was indicted in a federal case before another judge in this district, *United States v. Shafinia*, 09-cr-20039 (E.D. Mich.). The *Shafinia* indictment charged McDaniel with conspiracy to possess with intent to distribute and unlawful distribution of fraudulently obtained prescription pills, including oxycodone, hydrocodone bitartrate, and benzodiazaphine. (Dkt. 3 in 09-cr-20039.) It alleged specifically that

McDaniel and others met Dr. Sohrab Shafinia in parking lots and restaurants to exchange cash for prescriptions. (*See id.*) It did not allege conduct related to the Highwaymen matter before this Court. On March 23, 2009, Shulman entered his appearance on behalf of McDaniel in *Shafinia.* (Dkt. 2722-1, at 19.)

Six months later, on September 17, 2009, Shulman filed a reply brief for McDaniel in the appeal of the state court case. (*See* Dkt. 2795, at 2.) This appears to be the last action taken by Shulman in the state court case, but Shulman remained McDaniel's counsel of record throughout the remainder of the appeal, which was not officially terminated until January 2011.

On December 15, 2009, McDaniel was indicted in this case in the Second Superseding Indictment on a single count of conspiracy to transport stolen property in interstate commerce (Count Fifteen). (Dkt. 997, at 26-28.) His attorney of record in this case was Ronnie Cromer, but Defendant alleges that Shulman was surreptitiously representing McDaniel. The Court addresses that allegation below. (*See infra* Part VI.B.4.)

As stated above, Defendant was also indicted on Count Fifteen. (*See* Dkt. 997, at 26-28.) As to Defendant, Count Fifteen alleged the following: (1) "On or about April 10, 2006, Gary Ball Jr. told Doug Burnett the HMC planned to 'rip' some motorcycles in Myrtle Beach"; and (2) "In or about May 2006, Louis Fitzner, Eugene Trumph, and Gary Ball Jr unloaded stolen motorcycles at Southwest Transmission in Detroit, Michigan." (*Id.* at 28.) As to McDaniel, Count Fifteen alleged the following: "In or about May and June 2006, Randy McDaniel and David Foster supplied vehicle titles to members of the HMC." (*Id.*)

Defendant has directed the Court to Brzezinski's testimony from the grand jury proceedings in this matter, which elaborates on McDaniel's alleged role:

> Randy McDaniel is a Highwaymen down in the Monroe area. . . . Randy McDaniel sold a couple of [] titles directly to Aref Nagi to be able to register one of the bikes that we have seized. Actually, [] the one we seized at Eugene Trumph's shop was already titled in Great Lakes Chopper, but we were still able to identify it as stolen. . . . Randy was giving those titles or selling them to the Highwaymen.
>
> It makes it completely legit. If you get rid of the old title, you put a stamp on it . . . And now if you got clean titles, if you are on the street, unless it gets to an investigation like this where you actually take it off the street, examine it and go through every component of the bike, you are not going to be able to tell it's stolen.

(Dkt. 2722-2, at 3-5.) Crucially absent from both this testimony and the Second Superseding Indictment is any suggestion that McDaniel directed or participated in planning the theft of motorcycles from Myrtle Beach.

On March 3, 2010, McDaniel entered a guilty plea in *Shafinia*, and his sentencing date was set for June 14, 2010. (Dkt. 196 in 09-cr-20039.)

As Defendant's case neared its trial date in early 2010, Shulman filed motions to sever, for a jury questionnaire, and to dismiss the superseding indictment or to stay the proceedings challenging the master jury wheel. (Dkt. 1304; Dkt. 1305; Dkt. 1363.) Shulman also worked with counsel for the other defendants and joined in their motions, including a motion to prohibit co-conspirator statements. (See Dkt. 1077; Dkt. 1171.)

On April 5, 2010, Defendant's trial began. Over a period of almost two months, he was tried before a jury alongside five other Highwaymen: Aref Nagi, Michael Cicchetti, Leonard Moore, Joseph Whiting, and Anthony Clark. The Government called a number of cooperating co-defendants, including Doug Burnett, Robert Burton, Louis Fitzner, Gerald Peters, and Christopher Miller. It did not call McDaniel.

During trial, the Government offered overwhelming evidence of Defendant's guilt. As to the controlled substance charges, Burnett conducted three controlled purchases of 4.5 ounces of cocaine from Defendant. (Dkt. 1548, at 86.) Peters testified that "everybody knows that [Defendant] sells cocaine" and that he bought 4.5 and 8.5 ounces of cocaine from Defendant. (Dkt. 1928, at 132.) Miller testified that he saw Defendant sell cocaine and that he personally bought cocaine from Defendant. (Dkt. 1926, at 130-34.) Fitzner testified that Defendant engaged in cocaine transactions with Nagi. (Dkt. 1932, at 48-49.)

Regarding the stolen vehicle charges, Burton testified that he and Ball rented a U-Haul truck to transport stolen motorcycles from Myrtle Beach. (Dkt. 1918, at 21-22.) Fitzner testified that he was present when Defendant pulled up in a U-Haul with three motorcycles stolen from Myrtle Beach. (Dkt. 1932, at 57-58.) Moreover, the Government presented evidence that agents found numerous stolen motorcycles and cars with altered vehicle identification numbers while searching Defendant's family business, "Pal's Auto." (Dkt. 1570, at 144-49.) Trial testimony further revealed that Defendant possessed vehicles with altered VINs. (*Id.* at 163.)

On June 3, 2010, the jury convicted Defendant of the following: (Count One) substantive RICO; (Count Two) RICO conspiracy; (Count Fifteen) conspiracy to transport stolen vehicles; (Count Nineteen) conspiracy to possess with intent to distribute cocaine, marijuana, and ecstasy; (Count Twenty) conspiracy to possess with intent to distribute cocaine; and (Count Thirty-Six) conspiracy to alter, remove, and obliterate vehicle identification numbers. (Dkt. 1470.)

Two weeks later, on June 14, 2010, the Court in *Shafinia* adopted a stipulation adjourning McDaniel's sentencing date. (Dkt. 2722-1, at 20-21 (Dkt. 103 in 09-cr-20039).)

According to the stipulation, the parties agreed to adjourn for two reasons: (1) Shulman had been in trial before this Court for the previous month, making it difficult for the parties to prepare for the hearing; and (2) "[t]he scoring of the guidelines by the probation officer in this matter [was] different from the scoring anticipated by both of the Parties," and "Counsel request[ed] additional time to resolve the issue." (*Id.*)

On September 30, 2010, the Michigan Court of Appeals issued an order affirming McDaniel's conviction in the state court case. *People v. McDaniel*, No. 290689, LC No. 07-036304-FH (Mich. Ct. App. Sept. 30, 2010). One of the central issues on appeal was whether McDaniel's conviction for conducting a criminal enterprise was proper where "there was no evidence of an 'enterprise' involving anyone but himself." *Id.* at 1. The court decided that "defendant was involved in a criminal enterprise of altering identification numbers and selling stolen motor vehicles and parts" and that he could "be liable for conducting [that] criminal enterprise alone." *Id.* at 3. On January 11, 2011, the Michigan Court of Appeals closed the state court case.

On February 10, 2011, this Court sentenced Defendant to 30 years on Counts One, Two, and Nineteen (concurrent); 10 years on Count Fifteen (concurrent); 20 years on Count Twenty (concurrent); and 5 years on Count Thirty-Six (concurrent). (Dkt. 1781.)

On April 14, 2011, this Court dismissed McDaniel's charge in this case following the Government's motion to dismiss the second superseding indictment as to McDaniel. (Dkt. 1958.) The Government's motion stated the following: "The defendant pled guilty and was sentenced in case number 09-20039. The parties agreed that the instant case would be dismissed following a resolution in 09-20039." (Dkt. 1957.) Pursuant to Defendant's discovery request, the Government produced a copy of McDaniel's Rule 11 agreement

10

from *Shafinia*. It states: "If the Court accepts this agreement, the government will dismiss all remaining charges in this case as well as charges in Criminal Case no. 06-20465." (Dkt. 2891-1, at 9.)[2] It also provides that McDaniel will generally provide "information pertaining to any other criminal activity about which defendant is aware." (*Id.* at 6.) It does not provide for any active cooperation. (*Id.*)

## C. Defendant's Post-Conviction Proceedings

Following his conviction, Defendant filed a Rule 29 motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial under Rule 33. (Dkt. 1525.) These motions were denied. (Dkt. 1584.) Defendant then appealed to the Sixth Circuit, which affirmed his convictions and sentence on September 30, 2013. *United States v. Nagi*, 541 F. App'x 556 (6th Cir. 2013). During his appeal, Defendant asserted that his trial was substantially affected by prosecutorial misconduct, that there was insufficient evidence to support his conviction, that this Court erred by enhancing his sentence based on a "leadership role," and that he was improperly sentenced "based on drug amounts attributed to his co-conspirators." *Id.* at 568-69, 572-73, 575-76.

Defendant argued that the prosecution committed misconduct by, *inter alia*, (1) promising cooperating witness Doug Burnett a "bonus that was contingent upon conviction or the nature of the testimony given"; and (2) "proceeding to trial against him on Count 13 conspiracy to commit the murder of Burnett and then dropping the charge prior to jury deliberations." *Id.* at 568-69. The Sixth Circuit rejected the former argument on the ground that the "opportunity to cross-examine Burnett was a sufficient safeguard against

---

[2]Dkt 2891-1 is under seal and remains so. Only the specifically referenced text is narrowly unsealed.

impropriety." *Id.* at 568. And it rejected the latter argument on two grounds: First, "[t]here [wa]s no indication [] that the government had an improper motive for proceeding in the way that it did"; and, second, "the jury did not receive an indictment until the conclusion of the case, so it never knew that Ball faced the charge and, thus, could not have been prejudiced against Ball on that basis." *Id.* at 569.

The Sixth Circuit also rejected the argument that there was insufficient evidence to support his drug conspiracy convictions. It pointed to evidence that "Burnett executed at least three controlled buys of cocaine from Ball. . . . for about four and half ounces of cocaine," that Robert Burton, a major cocaine dealer, "testified that Ball was his competitor when it came to selling cocaine," and that "after executing a search warrant at Ball's home, agents seized 175.3 grams of cocaine." *Nagi*, 541 F. App'x at 572-73. The Sixth Circuit further rejected Defendant's contention that the Government did not establish that he participated in the "operation or management" of the criminal enterprise for purposes of Count One. *Id.* at 573. It explained: "Ball was an important member of the HMC. He was an 'honorary,' having achieved senior status, and also was the president of the Detroit East Side Chapter and opened his own chapter at Eight Mile. His principal role in stealing motorcycles also demonstrates his key position in the organization's illegal acts." *Id.*

As to this Court's application of a "leadership role" sentencing enhancement, the Sixth Circuit held that this Court's conclusions were "supported by the record." *Id.* at 576. Finally, the Sixth Circuit rejected Defendant's argument that he was improperly sentenced based on drug amounts attributed to his co-conspirators." The court explained that "a defendant is liable for quantities of drugs distributed by co-conspirators provided such amounts are

reasonably foreseeable to the defendant." *Id.* (citing *United States v. Lloyd*, 10 F.3d 1197, 1219 (6th Cir. 1993)).

Following the Sixth Circuit's decision, Defendant petitioned for a writ of certiorari, which was denied on April 7, 2014. *Ball v. United States*, 134 S.Ct. 1804 (2014).

Defendant timely filed his 28 U.S.C. § 2255 motion pro se on April 6, 2015, accompanied by a brief in support. (Dkt. 2655.) Defendant then retained counsel, and the parties supplied additional briefing. (Dkt. 2713; Dkt. 2765; Dkt. 2795.) Defendant also submitted several exhibits in support.

Next, on March 13, 2017, Defendant moved for discovery under Rule 6(a) of the Rules Governing § 2255 Proceedings. (Dkt. 2859.) Following a hearing on that motion, this Court issued an order granting in part and denying in part Defendant's motion for discovery. (Dkt. 2881.) Defendant then sought reconsideration of his discovery motion, which this Court denied in a second order. (Dkt. 2888.) This second order amended the first, elaborating on its findings and correcting an erroneous footnote.

Defendant subsequently filed a motion to compel discovery, alleging that the Government was not complying with this Court's order. (Dkt. 2889.) After reviewing the Government's two responses to Defendant's discovery requests and holding two telephonic conferences with counsel (the later one on the record), this Court concluded that the Government had complied with this Court's orders to the best of its ability and denied Defendant's motion to compel. (Dkt. 2906.)

On August 22, 2017, the Court held an evidentiary hearing, during which Shulman and Detective Sergeant Jeff Hart testified. The Court found both witnesses to be confident,

composed, and credible. Six days later, the parties provided oral argument summarizing the case. Defendant's § 2255 motion is now ripe for disposition.

## II.    Applicable Standard

Under 28 U.S.C. § 2255, "[a] prisoner in custody under sentence of a [federal] court . . . claiming the right to be released . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence."  To prevail on the motion, Defendant must show "(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid."  *McPhearson v. United States*, 675 F.3d 553, 559 (6th Cir. 2012) (quoting *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003)).

"It is well-established that a § 2255 motion 'is not a substitute for direct appeal.'"  *Ray v. United States*, 721 F.3d 758, 761 (6th Cir. 2013) (citations omitted).  "[C]laims that could have been raised on direct appeal, but were not, will not be entertained via a motion under § 2255 unless the petitioner shows: (1) cause and actual prejudice to excuse his failure to raise the claims previously; or (2) that he is 'actually innocent' of the crime."  *Id.* (citing *Bousley v. United States*, 523 U.S. 614, 622 (1998)).  And "[i]t is equally well settled that a § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law."  *Jones v. United States*, 178 F.3d 790, 796 (6th Cir. 1999).

## III.    This Court's Duty to Investigate Conflicts of Interest

Defendant argues that this Court was lax in its duty to investigate the potential conflicts of interests affecting O'Brien and Shulman.  This Court rejects that argument. According to the Sixth Circuit, a district court "has a duty to investigate the potential conflict"

when it "knows (or reasonably should know) that a potential conflict exists." *United States v. Kilpatrick*, 798 F.3d 365, 376 (6th Cir. 2015) (citing *Mickens v. Taylor*, 535 U.S. 162, 168 (2002)); *see also Cuyler v. Sullivan*, 446 U.S. 335, 346 (1980) ("Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry.").

As to O'Brien, this Court promptly investigated and resolved the potential conflict. O'Brien was charged via federal complaint with false statements on March 12, 2008. Nine days later, this Court set a hearing to discuss getting Defendant a new attorney. On May 8, 2008, this Court terminated O'Brien's representation of Defendant, prior to any motion cut-off or trial date, and twenty-three months before Defendant went to trial. Given that this Court facilitated O'Brien's expeditious replacement as defense counsel, Defendant is not entitled to relief on this ground.

Nor is he entitled to relief based on this Court's treatment of Shulman's potential conflict, as this Court neither knew nor should reasonably have known that it existed before Defendant filed his § 2255 motion. In *Sullivan*, the Supreme Court stated the following about potential conflicts: "[T]rial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel" because counsel "is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial." 446 U.S. at 347 (citation omitted). Here, neither of the cases in which Shulman represented McDaniel was before the undersigned, and neither the Government nor Shulman alerted the Court to the potential conflict. Furthermore, the record before this Court did not supply reason to know of the potential conflict; in a case involving 91 defendants, it would be unreasonable to expect this Court to have knowledge

of each attorney representing those defendants in their matters before other judges.  In light of the foregoing, this Court finds that the possibility of a conflict of interest was not sufficiently apparent to trigger a duty of further inquiry.

## IV.  Prosecutorial Misconduct

Defendant argues that the prosecution committed misconduct in several forms.  Each argument fails.

### A. Surreptitious Elicitation of Incriminating Evidence

Defendant states that he "is concerned" that the Government sent attorney Steve Vitale to visit him while he was incarcerated before trial to elicit information about this case, despite the fact that Defendant was indicted and represented by counsel at the time.  (Dkt. 2713, at 48.)  Defendant does not articulate a particular legal theory, cite any evidence, or provide any relevant authority.  This Court construes this "concern[]" as a Sixth Amendment argument and rejects it.

"A defendant is 'denied the basic protections' of the Sixth Amendment 'when there [is] used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel.'"  *Ayers v. Hudson*, 623 F.3d 301, 309 (6th Cir. 2010) (quoting *Massiah v. United States*, 377 U.S. 201, 206 (1964)).  "The right to counsel applies not only to direct confrontations by known government officers, but also to 'indirect and surreptitious interrogations' by covert government agents and informants."  *Id.* (quoting *United States v. Henry*, 447 U.S. 264, 273 (1980)) (emphasis in original).  "Therefore, a Sixth Amendment violation occurs whenever the State intentionally creat[es] a situation likely to induce [a defendant] to make incriminating statements without the assistance of counsel, or

16

knowing[ly] exploit[s] a situation in order to obtain incriminating information from a defendant without counsel being present." *Id.* (internal quotation marks and citations omitted).

Here, there is no support for Defendant's claim that Mr. Vitale served as a covert agent or informant beyond the following: (1) Defendant's "concern[]" that the Government sent Vitale; and (2) his vague assertion that a government witness testified about "subjects about which Vitale has asked [Defendant] for information." (Dkt. 2713, at 48.) As a result, there is no evidentiary basis for concluding that the Government either intentionally created a situation likely to induce incriminating statements without the assistance of counsel or knowingly exploited a situation to obtain incriminating information without counsel being present. Defendant's claim therefore fails.

## B. Aref Nagi's Alleged Work as a "Spy in the Camp"

Defendant argues that he is unconstitutionally confined because his co-defendant Aref Nagi may have acted as a "spy in the camp" during the pretrial and trial phases of the case. (*Id.* at 47.) As this Court noted in its order on Defendant's motion for discovery, this argument appears to contemplate two potential legal theories. First, Defendant may be arguing that the Government's failure to disclose Nagi's alleged role as an informant entitles him to relief under *Brady v. Maryland*, 373 U.S. 83 (1963). "Under *Brady*, [the defendant] must show that the Government failed to share evidence favorable to the accused, and that the suppression of evidence prejudiced the defendant." *Thomas v. United States,* 849 F.3d 669, 680 (6th Cir. 2017) (citing *Montgomery v. Bobby*, 654 F.3d 668, 678 (6th Cir. 2011)).

Alternatively, he may be arguing that the Government violated his Sixth Amendment right to a fair adversarial criminal process. *See United States v. Cronic*, 466 U.S. 648, 656

(1984). "[I]n order to establish a violation of the Sixth Amendment right to counsel ensuing from government surveillance, a claimant must not only show that conversations with an attorney were surreptitiously monitored, but must also show that the information gained was used to prejudice the claimant's defense in his criminal trial." *United States v. Collins*, 799 F.3d 554, 591 (6th Cir. 2015) (quoting *Sinclair v. Schriber*, 916 F.2d 1109, 1112 (6th Cir. 1990)).

As embodied in the Government's responses to Defendant's discovery requests, the record before the Court forecloses both theories. First, "there are no records of Nagi being signed up as a federal source of information or used in a federal prosecution," and neither the FBI nor the DEA has a record of Nagi working as a "cooperating witness, source of information, or informant for the federal government." (Dkt. 2886 at ¶ 31.) Further, "[n]either Nagi nor his counsel attempted to cooperate with the U.S. Attorney's Office or Federal Bureau of Investigation in connection with or immediately prior to or during the pendency of the underlying criminal matter." (*Id.* at ¶ 32.) Finally, "[t]here was no cooperation agreement between Nagi and any Assistant United States Attorney in the underlying criminal matter," and a search of multiple databases returned "no record of a cooperation agreement between Nagi and the U.S. Attorney's Office -- Eastern District [of Michigan] . . . for any time period." (*Id.* at ¶ 34.)

Given this overwhelming evidence that Nagi did not work as a "spy in the camp," this Court concludes that Defendant has failed to show that the Government violated his Sixth Amendment right based on government surveillance. Defendant has not shown that his conversations were surreptitiously monitored, let alone that any information gained was used to prejudice his defense during trial. *Collins*, 799 F.3d at 591. For similar reasons,

this Court concludes that Defendant has not demonstrated that he is entitled to relief under *Brady*. Defendant has not shown that the Government failed to share evidence favorable to him, let alone that the suppression of such evidence caused prejudice. *Thomas*, 849 F.3d at 680.

### C. The Government's Failure to Disclose Potential Conflicts of Interest

Defendant argues that the Government "certainly was aware of the conflicts attending both attorneys' representation" and "was required to insist on a hearing." (Dkt. 2713, at 6.) But the weight of authority suggests that, even if the Government was aware of potential conflicts, its failure to inform this Court and Defendant did not amount to a constitutional violation. *See* Anne Bowen Poulin, *Conflicts of Interest in Criminal Cases: Should the Prosecution Have a Duty to Disclose?*, 47 AM. CRIM. L. REV. 1135, 1182-83 (Summer 2010) ("There is little support for imposing a constitutional duty on the prosecution to inform the defendant or the court of potential conflicts on the part of defense counsel."). Defendant has not cited, and this Court has not found, a Sixth Circuit case directly addressing this issue, but the Third Circuit has explicitly held that a prosecutor's failure to disclose a potential conflict of interest does not require the reversal of a conviction. *United States v. Morelli*, 169 F.3d 798, 812 (3d Cir. 1999). Likewise, the Seventh Circuit has concluded that a prosecutor is not constitutionally required to advise the court of potential conflicts of interest. *Cerro v. United States*, 872 F.2d 780, 787 (7th Cir. 1989) ("[W]hether a prosecutorial duty to inform exists in these circumstances remains an open question. . . . [W]e conclude that it is not a constitutional requirement.").

And while decisions from the Fourth Circuit and Tenth Circuit contain dicta that the prosecution has a duty to inform the trial court of potential conflicts, neither decision

awarded relief on that ground or articulated what remedy follows a violation of that duty. *See United States v. Migliaccio*, 34 F.3d 1517, 1528 (10th Cir. 1994) ("[W]e find no reversible error under these particular circumstances since the government's pretrial motion did in fact prompt a hearing."); *United States v. Tatum*, 943 F.2d 370, 379-80 (4th Cir. 1991) ("In this case the government did identify a conflict situation[.]").  As a result, this Court finds the dicta in these cases less persuasive than the holdings discussed above. Furthermore, the Second Circuit decisions, upon which Defendant relies, did not hold that the prosecution's failure to disclose potential conflicts constitutes a constitutional violation. *See Ciak v. United States*, 59 F.3d 296, 306 n.8 (2d Cir. 1995) (suggesting that the prosecutor "would have been well advised to request such an inquiry himself")*, abrogated on other grounds by Mickens*, 535 U.S. 162; *United States v. Malpiedi*, 62 F.3d 465, 470 (2d Cir. 1995) (remarking that "the government can protect itself [from the vacatur of a sentence based on a conflict of interest] by informing the district judge of potential conflicts at the earliest possible moment").  Instead, those opinions merely admonished the prosecution, as a later Second Circuit opinion recognized.  *United States v. Stantini*, 85 F.3d 9, 13 (2d Cir. 1996) ("We therefore reiterate our admonition to the government in earlier cases to bring potential conflicts to the attention of trial judges."); *see also United States v. Kossak,* 275 F. Supp. 2d 525, 529 (D. Del. 2003) (finding that the Second Circuit cases simply "exhorted the prosecutor to advise the trial judge or defense counsel of the problem"), *aff'd*, 178 F. App'x 183 (3d Cir. 2006).  Given that there is not a direct pronouncement from the Supreme Court or the Sixth Circuit stating that there is a constitutional duty for the prosecution to disclose potential conflicts, nor persuasive authority to that effect, Defendant is not entitled to relief on this ground.

As part of this holding, the Court necessarily rejects Defendant's claim that he is entitled to relief because the Government failed to produce the August 2005 302s "that would have timely revealed Mr. O'Brien's conflict of interest." (Dkt. 2795, at 4.) The same is true of his claim that he is entitled to relief based on prosecutors' alleged awareness of Shulman's alleged conflict. (*See* Dkt. 2713, at 31 n.13.)

## D. Improper Remarks

Defendant argues that various remarks by the prosecution denied him due process. For this claim to succeed, Defendant must demonstrate that the prosecution's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Bryan v. Bobby*, 843 F.3d 1099, 1113 (6th Cir. 2016) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). In the Sixth Circuit, courts apply a two-step approach for determining if prosecutorial remarks violated a defendant's due process rights. *Gumm v. Mitchell*, 775 F.3d 345, 380 (6th Cir. 2014) (citing *Christini v. McKee*, 526 F.3d 888, 899 (6th Cir. 2008)). First, the court must consider whether the prosecution's remarks were improper. *Id.* (citing *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000)). Then, if the court concludes that the remarks were improper, it must determine if they were sufficiently flagrant to warrant reversal by looking to four factors: (1) the likelihood that the remarks would mislead the jury or prejudice the accused; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally presented to the jury; and (4) whether other evidence against the defendant was substantial. *Id.* (citing *United States v. Francis*, 170 F.3d 546, 549-50 (6th Cir. 1999)). In making this assessment, the court must consider the totality of the circumstances. *Id.* (citation omitted); *see also United States v. Beverly,* 369 F.3d 516, 543 (6th Cir. 2004) ("In examining prosecutorial

misconduct, it is necessary to view the conduct at issue within the context of the trial as a whole.").

The first set of allegedly improper remarks relate to Doug Burnett's decision to serve as a cooperating witness. Defendant argues that the Agent Brzezinski falsely testified before the grand jury and at trial that "Burnett simply came in and decided to tell the government what he knew." (Dkt. 2713, at 48.) The reality, Defendant insists, was that "Burnett already was under surveillance by the government for his role in storing kilos of narcotics in his father's house and, indeed, Burnett had contact with the agents who had the house under surveillance." (*Id.*) But Defendant has not cited any evidence supporting these claims. As a result, there is no basis for determining that Agent Brzezinski's remarks were improper. Furthermore, it is unlikely that the remarks either misled the jury or prejudiced the accused because (1) Defendant had ample opportunity to cross-examine Burnett about his decision to cooperate at trial; and (2) as discussed in Part I.B, *supra*, the evidence against Defendant was overwhelming.

Defendant next claims that the Government falsely presented facts concerning an incident that occurred at the Bridge Bar. Defendant was not prosecuted in regard to this incident, however, so these remarks could not have had a "substantial and injurious effect or influence in determining the jury's verdict." *Bryan*, 843 F.3d at 1113 (citation omitted). "If the misconduct was harmless, then as a matter of law, there was no due-process violation." *Id.*

The third set of allegedly improper remarks relate to Defendant's connection to the 8-Mile Clubhouse. Defendant argues that the Government misrepresented Defendant's connection to the 8-Mile Clubhouse to secure a 4-point leadership role increase at

22

sentencing. Even assuming that these remarks were improper, they did not prejudice Defendant because, as this Court stated in a previous order, there were "other bases in the record for concluding that Defendant served in a leadership role." (Dkt. 2888, at 5-6.)

Defendant also argues that the Government committed misconduct by falsely attributing certain quantities of cocaine to him during sentencing. He claims that these drugs were the product of "[Robert] Burton's own dealings" and had no connection to him. (Dkt. 2713, at 49.) This argument fails because the attribution of drug quantifies to Defendant based on the conduct of a co-conspirator was not improper, as confirmed on direct appeal. Defendant argued on appeal that he was improperly sentenced "based on drug amounts attributed to his co-conspirators." *Nagi*, 541 F. App'x at 576. The Sixth Circuit rejected that argument, explaining that "a defendant is liable for quantities of drugs distributed by co-conspirators provided such amounts are reasonably foreseeable to the defendant." *Id.* (citing *Lloyd*, 10 F.3d at 1219). Given the applicable law, attributing Burton's sales to Defendant was not improper.

Defendant finally claims that the Government "used information from 302s from another investigation to get the indictment that was returned in this case," even though it knew that the case "had nothing to do with the Highwaymen" and that "the law enforcement officers and prosecutors involved had been corrupt." (Dkt. 2713, at 49-50.) Defendant has not substantiated his claim regarding the Government's knowledge, so he has failed to show that its conduct was improper, let alone prejudicial.

For the reasons discussed above, the aforementioned remarks do not supply grounds for relief in isolation, and considering them together does not compel a different conclusion. Whether examined alone or collectively, these remarks did not so infect the proceedings

23

"with unfairness as to make the resulting conviction a denial of due process." *Bryan*, 843

F.3d at 1113 (citations omitted).

### D. Nondisclosure of *Brady* Materials

Near the end of his brief, Defendant baldly asserts that the Government "failed to

provide [Defendant] with discovery to which he was entitled, including, but not limited to,

*Brady*, *Giglio*, and other material, including material concerning the investigation in the

case, to which he constitutionally was entitled and was entitled under Rule 16 of the

Federal Rules of Criminal Procedure." (Dkt. 2713, at 47.) As stated above, for relief under

*Brady*, Defendant "must show that the Government failed to share evidence favorable to

the accused, and that the suppression of evidence prejudiced the defendant." *Thomas,*

849 F.3d at 680. Defendant's bald assertion does not make the requisite showing.

### E. Witness Tampering

Defendant's motion states that he "believes that [Detroit Police Officer Benito

Mendoza] was discussing witnesses' testimony with them while transporting them, getting

them to color testimony to protect some people on whose behalf he was working or in

whose interests he was acting, while getting them to implicate others who he did not know

or did not wish to favor." (Dkt. 2713, at 42.) Because Defendant has not substantiated this

belief with any evidence of witness tampering, he is not entitled to relief on this ground.

### F. Misconduct Regarding Count Thirteen

Defendant claims that the Government committed prosecutorial misconduct with

regard to Count Thirteen (conspiracy to murder). As this Court stated in its discovery order,

the Sixth Circuit already rejected this argument on direct appeal, and it is "well-settled that

a § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law." *Jones*, 178 F.3d at 796. Given that the Court cannot identify any "highly exceptional circumstances" for reconsidering this issue, Defendant is not entitled to relief on this ground. Additionally, even if reconsideration were warranted, the claim would still fail because the Court agrees with the Sixth Circuit's conclusion that Defendant was not prejudiced: "[T]he jury did not receive a copy of the indictment until the conclusion of the case, so it never knew that [Defendant] faced the charge and, thus, could not have been prejudiced against [Defendant] on that basis." *Nagi*, 541 F. App'x at 569.

### G. Failure to Present the Grand Jury with All of the Charged Crimes

Defendant argues that the Government never presented the grand jury with all of the crimes charged in the Second Superseding Indictment. Because this is a claim that should have been raised on direct appeal, it is procedurally barred unless Defendant shows "(1) cause and actual prejudice to excuse his failure to raise the claims previously; or (2) that he is 'actually innocent' of the crime." *Ray* , 721 F.3d at 761 (citing *Bousley*, 523 U.S. at 614). Defendant has not made the requisite showing, so the claim will not be entertained.

## V.   Fourth Amendment

Defendant argues that the Government violated his Fourth Amendment right to challenge the use of a search at the 8-Mile Clubhouse. (Dkt. 2713, at 49.) This argument is foreclosed by Defendant's failure to raise it in previous proceedings. As the Sixth Circuit has explicitly stated, "free-standing Fourth Amendment claims cannot be raised in collateral proceedings under either § 2254 or § 2255." *Ray*, 721 F.3d at 762.

## VI.    Conflicts of Interest

Defendant maintains that he was denied his right to the effective assistance of counsel because both of his attorneys,  Lee O'Brien and Lawrence Shulman, were burdened by conflicts of interest.  Ordinarily, to prevail on an ineffective assistance claim, a defendant must demonstrate (1) that counsel's performance was deficient and (2) that prejudice resulted.  *Strickland v. Washington,* 466 U.S. 668, 687 (1984).  However, under *Sullivan*, when a defendant asserts ineffectiveness arising from a conflict of interest, prejudice is presumed if the defendant demonstrates both that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance."  446 U.S. at 350.

According to the Supreme Court, "the *Sullivan* standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect." *Mickens*, 535 U.S. at 172 n.5.  The Court elaborated: "an 'actual conflict of interest' mean[s]. . . . a conflict that affected counsel's performance--as opposed to a mere theoretical division of loyalties."  *Id.* at 171; *see also Sullivan*, 446 U.S. at 350 ("[T]he possibility of conflict is insufficient to impugn a criminal conviction.").  To demonstrate that a conflict of interest adversely affected counsel's performance, a defendant must show that the conflict influenced his basic strategic decisions.  *Jalowiec v. Bradshaw*, 657 F.3d 293, 317 (6th Cir. 2011).  That is, the defendant must show that his attorney made a choice between alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other.  *Id.* (citing *Moss v. United States*, 323 F.3d 445, 466 (6th Cir. 2003).  "The existence of an adverse effect is 'more likely to be evident in cases in which an attorney takes positive steps on behalf of one client prejudicial to another than

in cases in which the attorney's actions are based on inaction and are passive.'" *Id.* (quoting *McFarland v. Yukins*, 356 F.3d 688, 706 (6th Cir. 2004)).

Contrary to Defendant's contention, the Sixth Circuit does not apply *Sullivan* to all conflict claims. In *Mickens,* the Supreme Court cautioned against applying the Sullivan standard "unblinkingly" to "all kinds of alleged attorney ethical conflicts." 535 U.S. at 174. Construing *Mickens*, the Sixth Circuit then found that "the presumed prejudice standard of *Sullivan* was clearly established only in the situation of a conflict of interest due to multiple concurrent representation." *Stewart v. Wolfenbarger*, 468 F.3d 338, 350 (6th Cir. 2006). The Sixth Circuit determined that *Mickens* left open whether *Sullivan* applies to other types of conflicts. *Id.* at 350-51.

### A. Lee O'Brien

Assuming, without deciding, that O'Brien's knowledge that he was the subject of a criminal investigation mandates the application of the *Sullivan* standard,[3] the Court concludes that a conflict of interest did not adversely affect his representation. O'Brien first learned of his potential conflict in November 2007, when Agent Brzezinski accused him of possessing a stolen Camaro. That was roughly four months before O'Brien was indicted in 08-mj-30123, which, in turn, was nine days before this Court set a hearing to replace O'Brien as Defendant's attorney. The only evidence of a potential adverse effect during

---

[3] Regarding conflicts arising out of defense counsel's own legal troubles, the Sixth Circuit has stated: "It is well-established that a conflict of interest may arise where defense counsel is subject to a criminal investigation." *Moss*, 323 F.3d at 472 (citing *Taylor v. United States,* 985 F.2d 844, 846 (6th Cir. 1993)). However, "the alleging party must demonstrate a nexus between the crimes of the client and the attorney." *Id.* Here, O'Brien was under investigation for making false statements to a federal officer, and a reasonable jurist might conclude that his charge did not share a sufficiently tight nexus with Defendant's charges to warrant the application of *Sullivan.*

that period lies in O'Brien's averment that he was "not able to enter into any meaningful plea negotiations on behalf of [Defendant] . . . based on my concerns arising from Brzezinski's threats against me personally, and finally from his call advising me he had a warrant against me."[4]  (Dkt. 2795-1, at 11-12.)  There is no potential proof of an adverse effect before then because "there is no proof of adverse effect . . . if the lawyer was ignorant of the facts giving rise to the conflict."  *McFarland*, 356 F.3d at 707.

O'Brien's averment is not proof of an adverse effect because plea negotiations were not a realistic strategic option before he was replaced.  *See Jalowiec*, 657 F.3d at 317 (stating that an adverse effect exists only if "counsel was influenced in his basic strategic decisions"); *Moss*, 323 F.3d at 469 (stating that a defendant "still must demonstrate that an actual conflict of interest caused his counsel to forgo plea negotiations" because "[t]he causative language of Sullivan requires . . . a nexus between the conflict and the adverse effect on counsel's performance.").  During the period that O'Brien might have been conflicted, the Government had yet to file the two superseding indictments, which added the central racketeering charge and brought Defendant's charged crimes from one to seven.  Given that the more significant charges against Defendant had not even been brought while O'Brien was his attorney, the Court credits the Government's contention that the notion of a plea resolution for Defendant at that time "is nothing but fiction."  (Dkt. 2765, at 11.)  Because O'Brien's failure to facilitate a plea resulted not from his strategic decision

---

[4] Defendant also alleges – without citation to or support in the record – that O'Brien's alleged conflict caused a failure (1) "to conduct an investigation that would have uncovered evidence tending to prove that [Defendant] was not involved in cocaine sales and was not involved in the retagging of stolen vehicles"; and (2) "to pursue the defense that [Defendant] was not involved in the interstate transportation and theft of vehicles."  (Dkt. 2713, at 25.)  Because these allegations lack substantiation, the Court rejects them.

but from its unavailability as an option, this Court will not presume prejudice based on O'Brien's alleged conflict.

In so holding, the Court rejects Defendant's allegation that AUSA Marion stonewalled O'Brien's attempts to seek a plea for Defendant because "O'Brien was quickly becoming the focus of the investigation in the case." (Dkt. 2713, at 22.) The record does not establish, directly or circumstantially, that O'Brien was "the focus" of the investigation in this case or that the investigation into O'Brien's alleged false statements lessened the Government's interest in dealing with Defendant. Also, the fact that other defendants might have been cooperating at the time also does not alter this Court's conclusion regarding the availability of a plea for Defendant. Neither does O'Brien's averment that Agent Brzezinski expressed an interest in negotiating out a plea deal. O'Brien avers that he "recall[s] a time . . . when Agent Brzezinski approached me and told me that the government would be willing to make a deal for [Defendant], with a sentence in the 5 year range." (Dkt. 2795-1, at 11.) In the absence of a clearer indication of when "a time" was, or evidence of a formal offer from a prosecutor involved in the case, this Court does not find that O'Brien's alleged conflict adversely affected his representation.

As to the case on which Defendant principally relies, *Rugiero v. United States*, it actually demonstrates the relative weakness of Defendant's argument.[5] 330 F. Supp. 2d 900 (E.D. Mich. 2004). There, the attorney who represented the defendant during pretrial,

---

[5] The circumstances in the other case cited by Defendant, *United States v. Williams,* also diverge sharply from this case. 372 F.3d 96 (2d Cir. 2004). There, the conflicted counsel was removed only ten months before trial, while O'Brien was removed twenty-three months before trial. *Id.* at 101-02. Furthermore, there was no superseding indictment filed after the attorney's removal in *Williams*, while two superseding indictments followed O'Brien's removal. *Id.*

trial, and sentencing was the subject of a criminal investigation by the same prosecuting authority that was prosecuting the defendant. *Id.* at 907. That attorney was ultimately indicted between the defendant's trial and sentencing, and he later pled guilty to conspiracy and tax charges, resulting in a twelve month prison sentence. *Id.* at 902. Applying the *Sullivan* standard, the court granted a new trial because the defendant's counsel was operating under an actual conflict of interest that adversely affected his representation. *Id.* at 909.

Explaining how the attorney's conflict adversely affected his representation, the *Rugiero* court identified four adverse effects: (1) failing to pursue plea negotiations; (2) delaying the trial to his client's detriment; (3) failing to defend his client's interests with respect to a violation of a sequestration order by a key government witness; and (4) rendering unreliable the jurors' responses to questions about whether they had seen broadcasts reporting that defense counsel was the subject of a federal criminal investigation. *Id.* at 907-09. Here, unlike the attorney in *Rugiero*, O'Brien only represented Defendant during the early portion of pretrial proceedings; he did not represent Defendant through a majority of the pretrial, trial or sentencing. Furthermore, instead of four adverse effects, Defendant has only offered evidence related to one adverse effect, which the Court finds illusory for the reasons above. In sum, *Rugiero* does not advance Defendant's claim.

**B. Lawrence Shulman**

Assuming, without deciding, that Shulman's representation of McDaniel mandates the application of the *Sulllivan* standard,[6] the Court concludes that a conflict of interest did not adversely affect Shulman's representation of Defendant.

### 1. Plea Negotiations

Defendant claims that Shulman's alleged conflict prevented him from pursuing plea negotiations on Defendant's behalf. The Sixth Circuit has recognized that an adverse effect may exist where a conflict prevented an attorney from exploring possible plea negotiations and the possibility of an agreement to testify for the prosecution. *McElrath v. Simpson*, 595 F.3d 624, 632 (6th Cir. 2010) (quoting *Holloway v. Arkansas*, 435 U.S. 475, 490 (1978). However, a defendant "still must demonstrate that an actual conflict of interest caused his counsel to forgo plea negotiations." *Moss*, 323 F.3d at 469. "The causative language of *Sullivan* requires that the defendant demonstrate a nexus between the conflict and the adverse effect on counsel's performance." *Id.*

At the evidentiary hearing, Shulman testified that he and Defendant discussed the possibility of a plea arrangement, that Defendant authorized him to seek a plea

---

[6] After *Mickens*, the Sixth Circuit determined that prejudice should not be presumed under *Sullivan* in a successive representation case unless it is an "atypical form of successive representation," where the facts more closely resemble a concurrent representation case. *Jalowiec*, 657 F.3d at 315-17 (construing *Moss*, 323 F.3d 445). While the record seems to establish the concurrent representation of Defendant and McDaniel (or at least an "atypical form of successive representation"), a reasonable jurist might conclude that Shulman's representation of McDaniel and Defendant was simply successive. The reasoning might proceed as follows: McDaniel was not indicted in this case until December 15, 2009. Shulman's final contribution to the state court case occurred before then, when he filed a reply brief on September 17, 2009. (*See* Dkt. 2795, at 2.) And while McDaniel did not enter his guilty plea in *Shafinia* until March 3, 2010, that case had no connection with the conduct charged in this case. Furthermore, Defendant's trial did not begin until after that plea, in April 2010.

arrangement, and that discussions with the Government followed.  Shulman further testified that these discussions reached an impasse because the Government insisted upon a guilty plea on a conspiracy to commit murder charge, while Defendant would not accept a guilty plea on that count.  As stated above, this Court found that Shulman testified confidently and credibly. This Court thus rejects Defendant's self-serving assertion and concludes that Shulman's alleged conflict did not cause him to forgo plea negotiations.

## 2. Alternative Defenses

Defendant next argues that Shulman's alleged conflict prevented him from pursuing certain defenses that would have benefitted Defendant but inculpated McDaniel or undermined stories McDaniel had told the Government.  (Dkt. 2713, at 7-8.)  Explaining "when foregoing an available defense because of a conflict of interests constitutes evidence of 'adverse effect,'" the Sixth Circuit "has been quite rigorous in demanding more than omission of a hypothetical or 'potential' defense to establish adverse effect." *McFarland*, 356 F.3d at 706.  It requires proof "that the choice was not part of a legitimate strategy, judged under the deferential review of counsel's performance prescribed in *Strickland*[.]"[7]  *Id.*

Elaborating on that standard, the Sixth Circuit explained: "Even where the lawyer omitted some course of action that undoubtedly would have been advantageous to the defendant, there is no proof of adverse effect if there is some other adequate explanation for the omission."  *Id.* at 707 (citing *Moss*, 323 F.3d at 470).  This is because the Supreme

---

[7] In announcing this standard, the Sixth Circuit rejected defendant's position that he need only establish a "plausible" defense that "was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."  *McFarland*, 356 F.3d at 706 (declining to follow *Winkler v. Keane*, 7 F.3d 304, 309 (2d Cir. 1993)).

Court has held that "counsel's omission of a defense pointing the finger at another person was not evidence counsel was motivated by loyalty to the other person" when that decision had a "'sound strategic basis.'" *Id.* (quoting *Burger v. Kemp*, 483 U.S. 776, 784 (1987)). On the other hand, an adverse effect exists "where counsel fails to pursue a strong and obvious defense, when pursuit of that defense would have inculpated counsel's other client, and where there is no countervailing benefit to the defendant from foregoing that defense or other explanation for counsel's conduct." *Id.* (emphasis added).

Defendant offers several arguments related to Shulman's alleged failure to pursue certain defenses as a result of a conflict. These arguments fail, whether taken alone or collectively, because the record does not show either that Shulman failed to pursue "a strong and obvious defense" that would have inculpated McDaniel or that there is no "other adequate explanation" for Shulman's decisions. *Id.*

As a threshold matter, Shulman explained at the evidentiary hearing that his trial strategy involved showing that: (1) Defendant had very limited involvement with the Highwaymen; (2) Defendant was not part of the leadership group; and (3) when it came to the overt acts alleged in the indictment, Defendant was not there. Shulman added that he tailored his questioning of government witnesses along those lines. Furthermore, he testified that he did not refrain from asking any questions because of McDaniel, that it never crossed his mind to do so, and that he did not avoid discussions of Great Lakes Choppers. Based on its knowledge of the record, the proceedings at trial, and its judgment of Shulman's credibility, the Court credits the foregoing testimony and concludes that Shulman's decisions were consistent with a reasonable, legitimate trial strategy. The Court addresses Defendant's specific assertions with more particularity below.

First, Defendant argues that Shulman failed to object to Burton's testimony about what was "in truth McDaniel's scheme having nothing to do with any conduct by Mr. Ball." Specifically, Defendant alleges that when Burton "admitted that he never saw [Defendant] with a stolen motorcycle, Shulman missed the point entirely and never used that in his closing." (Dkt. 2713, at 38.) That allegation is false. Shulman confronted this testimony directly at closing:

> There's a count of transporting a stolen motorcycle and some testimony that [Defendant] is in Myrtle Beach. But the question they asked Mr. Burton is did you ever see Mr. Ball with a stolen motorcycle? And what was his answer here to that? No. He told you that on April 13th in trial. I wrote it down.

(Dkt. 2435, at 118.) Defendant also argues that Shulman failed to challenge Burton's testimony that he saw members of the Highwaymen steal motorcycles before May 2006; failed to confront his statement that he and Ball traveled together to rent a U-Haul truck; and "left unchallenged" Burton's testimony concerning the amount of money made on the stolen bike scheme. (Dkt. 1560, at 22; Dkt. 2713, at 37-38.) In reality, Shulman both argued that Defendant was not involved in the bike scheme and questioned Burton's credibility vigorously. Indeed, Shulman cross-examined Burton for an extensive period across two days of trial, challenging his veracity and credibility throughout. (*See* Dkt. 1560, at 38-121; Dkt. 1920, at 5-29.) He then revived the issue of Burton's credibility during closing, referring to his testimony as "BS" and posing the following question: "Agent Brzezinski tells you he doesn't believe what Mr. Burton is telling him at times, yet he's called by the government as a witness in their case, someone that they don't believe, and you're supposed to take their testimony and believe it?" (Dkt. 2435, at 117-118.) In light

of the foregoing, the record does not support Defendant's claim that Shulman's alleged conflict adversely affected his confrontation of Burton.

Defendant next claims that Shulman's conflict caused him to refrain from offering evidence and argument related to McDaniel's "primary role" with "Great Lakes Choppers," which would have demonstrated that Defendant was not involved in the conduct charged in Count One, Racketeering Act Eight and Count Fifteen. (Dkt. 2710, at 34.) Specifically, Defendant proposes that, had Shulman confronted Agent Brzezinski with his grand jury testimony regarding McDaniel's provision of titles to the Highwaymen, it would have shown that McDaniel was responsible for the conduct charged to Defendant. (*Id.*) The Court disagrees.

Count One, Racketeering Act Eight charged Defendant with knowingly transporting stolen vehicles from South Carolina to Michigan. (Dkt. 997, at 13-14.) Count Fifteen charged Defendant with the following conduct: (1) "On or about April 10, 2006, Gary Ball Jr. told Doug Burnett the HMC planned to 'rip' some motorcycles in Myrtle Beach"; and (2) "[i]n or about May 2006, Louis Fitzner, Eugene Trumph, and Gary Ball Jr. unloaded stolen motorcycles at Southwest Transmission in Detroit, Michigan." (Dkt. 997, at 28.) Before the grand jury, Agent Brzezinski testified that McDaniel contributed to the scheme by re-tagging stolen vehicles, "get[ting] rid of the old title" and "put[ting] a stamp" on already stolen bicycles to make them "legit." (Dkt. 2722-2, at 3-5.) He did not testify that McDaniel was ever in South Carolina, that he helped steal the motorcycles, or that he helped transport the motorcycles. Accordingly, confronting Agent Brzezinski with testimony about re-tagging would not have shown that McDaniel planned or directed the theft of motorcycles from Myrtle Beach, let alone contradicted the evidence that Defendant transported stolen

vehicles and was among the primary participants in the scheme. In sum, Shulman's failure to confront Agent Brzezinski with this testimony does not establish a failure to pursue a "strong and obvious defense." *McFarland*, 356 F.3d at 707.

Third, Defendant asserts that the appearance of certain motorcycles in both McDaniel's state court indictment and the pretrial discovery materials in this case shows that Shulman overlooked proof that the "stolen motorcycle and re-tagging scheme[] was all about McDaniel." (Dkt. 2795, at 13.) Defendant alleges that these particular bikes were both "part of the allegations against [him]" and among the bases for Wisner's suggestion that Defendant was responsible for $400,000 worth of stolen bikes. (Dkt. 2713, at 28, 41.) However, Defendant has not substantiated either claim with record support, and the record belies his claim. Contrary to Defendant's contention at oral argument, Wisner's reference to McDaniel as the "king of VIN alteration" does not support Defendant's contention that McDaniel was either the king of stealing vehicles or the king of the whole operation. Furthermore, the conduct charged to Defendant involved motorcycles stolen from Myrtle Beach, and Shulman and Hart both testified that the vehicles stolen from Myrtle Beach were not involved in McDaniel's state court case.[8] In light of the foregoing, Shulman's failure to present or solicit evidence related to the motorcycles in McDaniel's state court case does not establish an adverse effect.

Fourth, Defendant argues that Shulman's alleged conflict caused his failure to emphasize "that nowhere in the FBI reports, NICB, Neal Wisner's reports or the Michigan

---

[8] McDaniel's Declaration avers that the allegations in the case before this Court were "for essentially the same conduct that I was convicted of in the earlier Michigan state case[.]" (Dkt. 2910-1, at ¶ 4.) But that is a legal conclusion that McDaniel is incompetent to offer, and it is unsupported by the record.

State Police reports . . . was there any indication whatsoever that [Defendant] was in any way involved" with the charged conspiracy. (Dkt. 2713, at 35.) Being fully advised with the record in this case and the proceedings at trial, the Court finds that this alleged failure is not evidence of an adverse effect. At the evidentiary hearing, Shulman provided an adequate explanation for declining to offer such an argument. He explained that his strategy included not disputing "facts beyond change" so that he could maintain his credibility with the jury. Choosing not to argue that Defendant was not "in any way involved" was consistent with Shulman's reasonable, legitimate strategy and, therefore, not an adverse effect.

Defendant fifth alleges that Shulman's alleged conflict led him not to seek testimony from Jose Valle. According to Defendant, Valle received a stolen bicycle from McDaniel and would have testified to that effect. (*See* Dkt. 2713, at 35-36.) But Valle's testimony would not have aided "a strong and obvious defense" because his receiving a stolen vehicle from McDaniel does not tend to disprove the conduct charged to Defendant in this case. Indeed, evidence of Defendant's participation in and planning of the scheme to steal motorcycles from Myrtle Beach is not contradicted or undermined by McDaniel's sale of a stolen vehicle. Thus, Valle's proffered testimony is not proof of an adverse effect.

Sixth, Defendant alleges that Shulman's conflict caused his failure to solicit evidence from Gary Eizak. As reflected in Eizak's declaration, he would have testified regarding the Bridge Bar incident. (Dkt. 2722-2, at 27-28.) Defendant was not prosecuted in relation to the Bridge Bar incident, however, so the failure to solicit evidence from Eizhak is not evidence of an adverse effect.

Seventh, Defendant alleges that Shulman's conflict caused him not to solicit evidence from Trumph, who could have offered "solid proof that [Defendant] had nothing whatsoever to do with any stolen motorcycle scheme, and certainly not the stolen motorcycle scheme attributed to [Defendant] at trial and sentencing (which was, in reality, McDaniel's scheme)." (Dkt. 2713, at 36.)  Defendant points to an FBI 302 reflecting that, on June 6, 2016, "Custom Motorcycle, VIN 1G95WZ0755C311077 (stolen)" was seized pursuant to a search warrant executed at Southwest Transmission and Auto, which Trumph owned.  (Dkt. 2722-2, at 9.)  This 302 further reflects that Trumph stated that the motorcycle belonged to a man named Steve and that Steve's mother had brought the title to him.  (*Id.*) Defendant has also submitted an affidavit from Trumph, which avers "[a]t no time was Gary Ball, Jr. in any way involved with criminal activity related to a stolen motorcycle brought to my garage."  (Dkt. 2722-2, at 20.)

Being fully advised with the record and the proceedings at trial, the Court finds that these submissions would not have supported a strong and obvious defense.  Furthermore, Shulman has provided an adequate explanation for declining to offer this evidence.  As discussed above, Shulman's reasonable trial strategy involved not challenging "facts beyond change" so that he could maintain his credibility with the jury.  Choosing not to pursue the line of defense contemplated by Trumph's proffered testimony is consistent with that strategy and, therefore, not an adverse effect.

Defendant finally states that he "believes that the prosecution told Ricky Frank not to mention the fact that his motorcycle had its numbers ground out, and re-stamped with Great Lakes Choppers VIN numbers in order to avoid having it attributed to McDaniel - and Shulman was only too happy to oblige."  (Dkt. 2713, at 39.)  Defendant has not adduced

any support, beyond his belief, that this conduct occurred, so the Court rejects his argument that Shulman failed to pursue a "strong and obvious defense" during his questioning of Frank.

### 3. Motion Practice

Defendant posits that Shulman's conflict led him not to "challenge matters in pre-trial or in limine motions." (Dkt. 2713, at 46.)  But, as discussed in Part I.B, *supra*, Shulman actively filed and joined motions leading up to Defendant's trial, so this claim lacks merit. Equally unavailing is Defendant's contention that he is entitled to relief based on Shulman's failures to object to a 10-day adjournment of the trial, to move to dismiss the indictment, or to move for a bill of particulars.  To demonstrate an adverse effect, Defendant must show that Shulman's representation of McDaniel led Shulman not to make that objection or file those motions.  Because he has not done so, these arguments fail.

### 4. Other Allegations

Before moving on, it bears mentioning that this Court has not ignored other allegations related to Shulman's alleged conflict; it has simply found that they do not demonstrate an adverse effect. For example, Defendant alleges that Shulman was surreptitiously representing McDaniel in this case,[9] as evidenced by the plea agreement in *Shafinia* by which McDaniel's charge in this case was dismissed.  (*See* Dkt. 2795, at

---

[9] For the record, Shulman unequivocally contested this allegation, testifying that (1) he told McDaniel that he could not represent him before this Court due to a conflict; and that (2) it was the prosecution that suggested dismissing the claim in this matter because McDaniel's sentencing exposure was much greater in *Shafinia*.  This Court finds that testimony credible, but it is inessential to the holding.

5-6.) Even assuming the truth of that claim, it does not establish that Shulman's representation of Defendant was adversely affected.[10]

Nor does the admonishment from the Michigan State Bar show that Defendant is entitled to relief. Defendant claims that "the Michigan State Bar has admonished Shulman for his multiple conflicts." (Dkt. 2795, at 17.) However, the admonishment appears to relate to Shulman's failure to answer Defendant's complaint and does not reflect a finding that he was acting under a conflict of interest.[11] Second, even if the State Bar had found a conflict of interest, it would not compel a finding that Defendant's constitutional rights were violated. As the Sixth Circuit has stated, "[t]he constitutional question we must answer is not whether [the defendant's] attorneys violated ethical rules, but whether an actual conflict existed that adversely affected their performance." *Kilpatrick*, 798 F.3d at 375.

As to Defendant's allegation that McDaniel was "a primary source of information" against Defendant, it is unsubstantiated. (*See* Dkt. 2795, at 2.) Although McDaniel's Rule 11 agreement contemplates cooperation with the Government and notes from a proffer session reflect McDaniel's statement that he was a source of information for Detective Hart,

---

[10] In support of this allegation, Defendant points to an email from Cromer to the prosecutors in this case, which states: "Sometime ago, attorney Lawrence Shulman . . . indicated to me that Mr. McDaniel had entered into a plea agreement that would in essence resolve and/or dispose of the instant criminal matter (Nagi case). However, I've never seen any such document to this affect [sic]." (Dkt. 2891-1, at 28.) (Dkt 2891-1 is under seal and remains so. Only the specifically referenced text is narrowly unsealed.) Defendant also emphasizes McDaniel's averment that he only met Cromer once and that "Shulman continued to act as my lawyer for all purposes in all cases." (Dkt. 2910-1, at 1.) Neither of these submissions alter the fact that Defendant has not demonstrated an adverse effect.

[11] This Court discussed the issue in more detail in its order resolving Defendant's motion for discovery. (*See* Dkt. 2881, at 10-11.)

neither document establishes that McDaniel provided information against Defendant. And McDaniel's affidavit notably omits any averment that McDaniel provided information on Defendant.

Moreover, the evidence before the Court supports the contrary finding that McDaniel did not provide information regarding Defendant. The Government has averred that "the FBI case agent never interviewed Mr. McDaniel as part of his investigation and both the undersigned and the case agent are unaware of any attempts by McDaniel to cooperate, at any time, with law enforcement in their investigation of the Detroit Highwaymen Outlaw Motorcycle Club." (Dkt. 2868, at 8.) The Government's responses to Defendant's discovery requests also reflect that the Brownstone Township Police Department, Wisner, and Officer Mendoza have no records of interviews of McDaniel. (Dkt. 2886 at ¶¶ 10-12; Dkt. 2905 at ¶¶ 10-12.[12]) Testimony from the evidentiary hearing also undermines Defendant's allegation. Shulman testified that he had no knowledge of McDaniel cooperating in this matter, and Hart denied at the evidentiary hearing that he ever received information from McDaniel related to the Highwaymen investigation or served as McDaniel's handler. In fact, he called the prospect "ludicrous." In light of the foregoing, the record does not show that McDaniel provided information against Defendant.

Finally, Shulman's removal from the case on appeal does not advance Defendant's conflict claim. During direct appeal, the Sixth Circuit replaced Shulman as Defendant's counsel because he failed to file a brief, despite continual requests from the Clerk's office.

---

[12]Dkt 2905 is under seal and remains so. Only the specifically referenced text is narrowly unsealed.

(Dkt. 2894-1.)  Given that Defendant has not shown a causal link between Shulman's removal and his alleged conflict, Defendant is not entitled to relief on this ground.

## VII.  Ineffective Assistance Regardless of Conflicts

Defendant also argues that both of his attorneys provided ineffective assistance of counsel regardless of whether they were operating under conflicts.  As stated above, to succeed on a vanilla ineffective assistance of counsel claim, a § 2255 movant must show that his counsel's performance was both deficient and prejudicial to his defense. *Strickland*, 466 U.S. at 687.  To demonstrate deficient performance, Defendant must "show[] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*  Phrased differently, Defendant must demonstrate that his counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688.  In application, the standard is "highly deferential, and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Mallett*, 334 F.3d at 497 (quoting *Strickland*, 466 U.S. at 689).

To demonstrate prejudice, Defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*  The fundamental question is whether the proceeding was "fundamentally unfair or unreliable; a court should not focus the analysis on the outcome." *Kinnard v. United States*, 313 F.3d 933, 935 (6th Cir. 2002) (citing *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)).

### A. Lee O'Brien

When evaluating a claim under *Strickland*, the Court may begin with the prejudice prong when it is dispositive. *See Baze v. Parker*, 371 F.3d 310, 321 (6th Cir. 2004) ("We do not need to address the question of competence, however: '[I]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.'") (quoting *Strickland*, 466 U.S. at 697). Here, the Court rejects Defendant's ineffectiveness claim because he has not demonstrated a reasonable probability that, but for some unprofessional error committed by O'Brien, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

This Court replaced O'Brien as defense counsel prior to any motion cut-off or trial date, and twenty-three months before trial. Defendant and his new counsel thus had almost two years to prepare for trial, file motions, negotiate a plea, and otherwise remedy any errors. Even if this were not the case, Defendant has only alleged one error, and it does not warrant a finding that the proceedings were "fundamentally unfair or unreliable." *Kinnard*, 313 F.3d at 935. Indeed, Defendant argues that O'Brien's failure to pursue plea negotiations prejudiced him, but this lacks merit for the same reason it does not justify presuming prejudice under *Sullivan*: plea negotiations were not a realistic option at the time. In light of the foregoing, the Court will not grant Defendant relief based on O'Brien's alleged ineffective assistance.

## B. Lawrence Shulman

### 1. Pretrial

Defendant argues that Shulman was ineffective during pretrial in a variety of ways. The Court rejected many of these same arguments when addressing Shulman's alleged conflict of interest, and the allegations that were insufficient under *Sullivan* fare no better

43

under *Strickland*'s more exacting standard. These previously rejected – and still unavailing – claims relate to: (1) failures to file pretrial motions to dismiss the indictment and for a bill of particulars; (2) failures to pursue a plea resolution; and (3) failures to solicit evidence from Trumph, Eizak, and Valle.

Defendant also asserts that Shulman was inadequate with respect to his advice, trial, strategy, and preparation. (Dkt. 2713, at 40-41.) Specifically, he claims that Shulman repeatedly cancelled meetings and met with Defendant only twice, never discussed discovery, never advised Defendant about the elements of the charges against him, and misinformed Defendant about the sentence he faced. At the evidentiary hearing, Shulman disputed all of these claims, and the Court found his testimony credible. Accordingly, the Court rejects Defendant's self-serving assertions. (*Id.*)

Next, Defendant alleges that Shulman "was ineffective for failing to properly challenge the search and seizure at '8-Mile,' the fruits of which were used against [Defendant] when in fact he had no connection to such fruits." (Dkt. 2713, at 40.) The Court rejects this claim because Defendant has failed to demonstrate prejudice. The only argument Defendant offers regarding the search of the 8-Mile property relates to its use to secure a 4-point leadership role increase at sentencing. But, as the Court explained above, there were other bases in the record for concluding that Defendant served in a leadership role.

Finally, Defendant makes a one sentence argument, that Shulman failed to timely challenge the grand jury's return, without having heard evidence of all the crimes charged, of the second superseding indictment. (*Id.* at 43.) Defendant fails to support this claim, and shows neither deficient representation nor prejudice. "Trial strategy includes the decision not to file certain motions if, after investigation, doing so would not be necessary

or advantageous." *United States v. Hinds*, 2 F. App'x 420, 423 (6th Cir. 2001) (citing *Austin v. Bell*, 126 F. 3d 843, 848 (6th Cir. 1997)). In fact, Shulman did file a motion to dismiss the second superseding indictment just on an alternate theory. (Dkt. 1363.) Defendant presents nothing to suggest he was prejudiced by counsel's decision and in the absence of some indication that this argument would have succeeded, Defendant's argument fails. *Strickland*, 466 U.S. at 694.

## 2. Trial

Defendant claims that Shulman was ineffective during trial in several ways. Again, the Court rejected many of these allegations in its analysis of Shulman's alleged conflict, and the allegations that were insufficient under *Sullivan* fare no better under *Strickland*'s more exacting standard. These previously rejected – and still unavailing – claims relate to Shulman's alleged failures to cross-examine or confront the testimony of Burton, Frank, Brzezinski, and Wisner.

Defendant's next claim, that Shulman should have objected to Wisner's qualification as an expert, fails because Shulman's decision was not objectively unreasonable. Furthermore, Defendant has not shown how this decision prejudiced him.

Defendant further claims that Shulman was ineffective for failure to object to improper jury instructions allowing a conviction under a general verdict, which did not require a specified drug quantity. (Dkt. 2713, at 43.) This argument fails because the jury's verdict specifically found that Defendant conspired to distribute or possessed with intent to distribute more than 5 kilograms of cocaine. (Dkt. 1470, at 9.)

Defendant's remaining claims all fail because there was no prejudice attached. The allegedly deficient decisions for which Defendant has not established prejudice include the following: (1) failure to object to the 10 day adjournment the Court took after the close of the Government's case to attend a Judicial Conference; (2) failure to file reply briefs to Rule 29 and 33 motions; (3) failure to object to the use of Officer Mendoza to transport witnesses; and (4) failure to timely move to dismiss Count Thirteen. Defendant has not shown a reasonable probability that, but for Shulman's failures to object to the 10 day adjournment and file reply briefs, the result of the proceedings would have been different. Furthermore, as stated above, Defendant has not shown that Mendoza tampered with witnesses, and, with regard to Count Thirteen, the Court agrees with the Sixth Circuit that the jury could not have been prejudice against Defendant on that basis because it never knew that Ball faced the charge.

### 3. Sentencing

Defendant argues that Shulman was ineffective for failing to object to the following during sentencing: (1) the attribution to Defendant of drugs attributable to a separate conspiracy having nothing to do with Defendant; (2) a false claim concerning Defendant's leadership role (based in part on false claims concerning the 8-Mile clubhouse); (3) this Court's attribution to Defendant of dealing in cocaine base; and (4) the inclusion at sentencing of drugs not appropriately included and which the Sixth Circuit found not properly to have been included in a related case, *United states v. Donovan*, 539 F. App'x 648 (6th Cir. 2013).

As discussed above, the attribution to Defendant of drugs distributed by his co-conspirator was permissible in this case, and the claims regarding the 8-mile clubhouse did

46

not cause him prejudice. Regarding the attribution of dealing in cocaine base, Defendant has not shown that this had any bearing on his sentence; therefore, he has not established prejudice.

Shulman's failure to raise the argument that led to a re-sentencing in *Donovan* also is not proof of ineffective assistance. In *Donovan*, the Sixth Circuit held that, due to an error in the jury instructions and the absence of a special verdict form, a defendant needed to be re-sentenced on Count 19 (Drug Conspiracy) with a statutory maximum of 5 years. 539 F. App'x at 652-53. The court explained:

> Moore should be resentenced on Count 19 employing a five-year statutory maximum sentence. The evidence presented against Moore focused overwhelmingly on marijuana and, to a lesser degree, cocaine. A defendant may not be sentenced under the statutory penalties for a cocaine conspiracy following a general jury verdict on a conspiracy to distribute both cocaine and marijuana as the jury may have found only a marijuana conspiracy. *United States v. Dale*, 178 F.3d 429 (6th Cir.1999). This is because the maximum statutory sentence for conspiring to distribute a controlled substance depends on the substance being distributed. 21 U.S.C. § 846. In the case of a general verdict, this information is lacking, and the district court may not impose a sentence exceeding the shortest maximum sentence for any one of the pertinent violations. *Dale*, 178 F.3d at 432. Therefore, Moore should be resentenced applying a statutory maximum of five years pursuant to 21 U.S.C. § 841(b)(1)(D).

*Id.* at 653. Here, the jury's verdict specifically found that Defendant conspired to distribute, or to possess with intent to distribute more than 5 kilograms of cocaine. (Dkt. 1470, at 9.) Therefore, the argument that succeeded in *Donovan* would have been unavailing here.

### 4. Appeal

As discussed above, the Sixth Circuit replaced Shulman as Defendant's appellate counsel because he failed to file a brief, despite continual requests from the Clerk's office. (Dkt. 2894-1.) Citing this default, Defendant claims that he was deprived of his Sixth

Amendment right to effective assistance of appellate counsel. (Dkt. 2713, at 31-32.) Defendant is incorrect.

On an appeal of right, a criminal defendant is entitled to effective assistance of counsel. *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008) (citing *Bowen v. Foltz*, 763 F.2d 191, 194 n. 3 (6th Cir. 1985)). Claims of ineffective assistance of appellate counsel are subject to the *Strickland* test, which requires a defendant to show both deficient representation and prejudice. *Id.* "With respect to prejudice in the context of ineffective assistance of appellate counsel, a defendant must show a reasonable probability that, but for his counsel's defective performance, he would have prevailed on appeal." *Mapes v. Tate*, 388 F.3d 187, 194 (6th Cir. 2004).

Shulman's removal alone is not evidence of prejudice because Defendant received replacement counsel, and Defendant has not shown how replacement counsel's performance was ineffective. Defendant simply asserts that substitute counsel "provided ineffective assistance of counsel, failed to meet with [Defendant], ignored specific requests as to issues to raise on appeal, and more." (Dkt. 2713, at 44.) These vague, bare allegations are not sufficient to "show a reasonable probability that, but for his counsel's defective performance, he would have prevailed on appeal." *Mapes*, 388 F.3d at 194.

## VIII. Certificate of Appealability

The Court may issue a Certificate of Appealability when the § 2255 movant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2).

> [T]he petitioner need not show that he should prevail on the merits. He has already failed in that endeavor. Rather, he must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner] or that the questions are "adequate to deserve encouragement to proceed further.

*Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) *overruled in part on other grounds by*

*Lindh v. Murphy*, 521 U.S. 320 (1997); *See Slack v. MacDaniel*, 529 U.S. 473, 475 (2000).

As reflected above, Defendant's § 2255 motion asserts several claims for relief. While

the Court has determined that each of those claims lacks merit, it nonetheless concludes

that Defendant is entitled to a Certificate of Appealability on two--and only two--of them: (1)

ineffective assistance of counsel arising out of O'Brien's alleged conflict of interest; and (2)

ineffective assistance of counsel arising out of Shulman's alleged conflict of interest. With

respect to these two claims, Defendant has shown that the issue is debatable among jurists

of reason, that a court could resolve the issue in a different manner, or that the question

is adequate to deserve encouragement to proceed further. With respect to his other

claims, Defendant has not made the requisite showing. Accordingly, the Court hereby

ISSUES a Certificate of Appealability only as to the two issues above.

## IX. Conclusion

For the foregoing reasons, Defendant's § 2255 motion is DENIED, but the Court

ISSUES a Certificate of Appealability as to the following issues: (1) ineffective assistance

of counsel arising out of O'Brien's alleged conflict of interest; and (2) ineffective assistance

of counsel arising out of Shulman's alleged conflict of interest.

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: September 19, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record
on September 19, 2017, by electronic and/or ordinary mail.

s/Carol J. Bethel
Case Manager